FILED

2025 Mar-26  PM 03:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **TOMMIE J. JONES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 1:23-cv-01506-MHH** |
| | } | |
| **LELAND DUDEK, ACTING** | } | |
| **COMMISSIONER OF SOCIAL** | } | |
| **SECURITY,** [1] | } | |
| | } | |
| **Defendant.** | } | |

### <u>MEMORANDUM OPINION</u>

Tommie J. Jones has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Jones's claim for supplemental security income based on an Administrative Law Judge's finding that Mr. Jones was not disabled.  Mr. Jones argues that the Administrative Law Judge— the ALJ—did not sufficiently evaluate the opinions of several consultative doctors. After review of the administrative record, for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

---

[1] On February 17, 2025, Leland Dudek became the Acting Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner Dudek as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds office, the "court may order substitution at any time. . . .").

## ADMINISTRATIVE PROCEEDINGS

To succeed in his administrative proceedings, Mr. Jones had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin*., 631 F.3d 1176, 1178 (11th Cir. 2011).

"The claimant has the burden of proof with respect to the first four steps." *Wright*

---

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Feb. 28, 2025).

*v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Mr. Jones applied for supplemental security income benefits on February 10, 2020. (Doc. 6-7, pp. 4-10).[3] Mr. Jones alleged that his disability began on January 1, 2011. (Doc. 6-7, p. 4).[4] The Social Security Commissioner initially denied Mr. Jones's claims, and Mr. Jones requested a hearing before an Administrative Law

---

[3] Mr. Jones indicated that he previously received disability benefits that were "stopped when he missed an appointment set up by the SSA." (Doc. 6-11, p. 3; Doc. 6-12, p. 26). The record is unclear as to when Mr. Jones's prior disability benefits began and ended, but the Court surmises he received benefits sometime before 2017. On August 22, 2017, Mr. Jones reapplied for SSI benefits. (Doc. 6-4, p. 6). Mr. Jones did not appear for a hearing, and the ALJ denied his application. (Doc. 6-4, p. 5). The Appeals Council remanded and directed the ALJ to determine if Mr. Jones had "good cause" for not appearing at the hearing, and if so, to schedule another hearing. (Doc. 6-4, p. 5). The ALJ held a telephone hearing on January 16, 2019 because Mr. Jones "ha[d] been banned from entering any Social Security office for any reason." (Doc. 6-4, p. 5). Mr. Jones "chose to appear and testify without the assistance of an attorney or other representative." (Doc. 6-4, p. 5). The ALJ found that Mr. Jones was not disabled and denied his application for benefits on March 26, 2019. (Doc. 6-4, pp. 5-16). The Appeals Council declined Mr. Jones's request for review on September 18, 2019. The Court cannot find in the record whether Mr. Jones appealed that decision to a federal district court.

[4] A claimant becomes eligible for SSI benefits in the first month in which he is "both disabled and has an SSI application on file." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *see also* 20 C.F.R. §§ 416.330, 416.335 (2023). For his SSI claim, Mr. Jones had to prove that he was disabled between the application date of February 10, 2020 through the ALJ's decision on April 21, 2023. *Moore*, 405 F.3d at 1211. Given Mr. Jones's prior award of disability benefits and the nature of Mr. Jones's long-standing chronic physical and mental impairments, Mr. Jones's medical records before February 2020 are relevant to whether he was disabled between February 2020 and April 2023.

Judge. (Doc. 6-4, p. 49; Doc. 6-5, pp. 3, 12, 20-21). Because of COVID, Mr. Jones and his attorney had a telephone hearing with an ALJ on February 6, 2023. (Doc. 6-3, pp. 51-76).[5] A vocational expert testified at the hearing. (Doc. 6-3, pp. 70-76).

The ALJ issued an unfavorable decision on April 21, 2023. (Doc. 6-3, pp. 30-41). On August 31, 2023, the Appeals Council declined Mr. Jones's request for review, (Doc. 6-3, p. 2), making the Commissioner's decision final and thus a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

---

[5] The ALJ initially scheduled an administrative hearing for April 25, 2022, but Mr. Jones's attorney requested a continuance because Mr. Jones was incarcerated and did not consent to a phone hearing. (Doc. 6-5, pp. 56-58). The ALJ rescheduled the hearing for August 29, 2022. (Doc. 6-5, pp. 67, 72, 86, 88). The ALJ, Mr. Jones's attorney, and a vocation expert appeared for the hearing. Mr. Jones did not appear for the hearing because he was in the Cherokee County jail. Mr. Jones's attorney requested that the ALJ reschedule and set a telephone hearing. (Doc. 6-3, pp. 77-80).

Regarding Mr. Jones's incarceration, a federal grand jury indicted Mr. Jones on several drug counts on July 27, 2021, and he was arrested and held in the DeKalb County Jail. (Docs. 1, 3 in 4:21-cr-231-CLM-GMB). On March 11, 2022, Mr. Jones pleaded guilty to four counts of distribution of methamphetamine in federal district court and remained in custody pending his sentencing. (Doc. 44 and Mar. 11, 2022 Minute Entry in 4:21-cr-231-CLM-GMB). On August 17, 2023, United States District Court Judge Corey Maze sentenced Mr. Jones to 77 months of imprisonment. (Doc. 46 in 4:21-cr-231-CLM-GMB). The federal prisoner locator indicates that Mr. Jones is incarcerated at FCI Forrest City Medium with a projected release date of March 1, 2028. *See* https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited Mar. 20, 2025).

Mr. Jones's March 11, 2022 felony conviction does not invalidate his February 10, 2020 application for supplemental security income, but his felony conviction may affect the amount he may recover if, on remand, the Social Security Administration awards benefits. *See* https://www.ssa.gov/reentry/benefits.htm?tl=0%2C1%2C2%2C3%2C4%2C5%2C7 (last visited Mar. 20, 2025) ("We generally do not pay . . . Supplemental Security Income (SSI) recipients during confinement for a crime in jail, prison[,] or certain other public institutions. [] If you get SSI, we will stop your payments after you are imprisoned for a month. [] However, if you are jailed 12 consecutive months or longer, you will have to file a new application and again be approved for SSI by Social Security.").

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Jones's Education Records*

Mr. Jones was in the special education program at Collinsville High School. (Doc. 6-3, p. 50; Doc. 6-13, p. 132).  He did not pass the Alabama High School Graduation Exam in reading, math, or language.  (Doc. 6-3, p. 50).  He received a "Certificate of Attendance" for attending school through the twelfth grade.  (Doc. 6-3, p. 50).

### *Mr. Jones's Medical Records*

To support his application, Mr. Jones submitted medical records relating to the treatment and diagnoses of major depressive disorder; bipolar disorder; anxiety; neck, back, shoulder, leg, and arm pain; lumbar and cervical radiculopathy; and chronic pain syndrome.[6]  The Court has reviewed Mr. Jones's complete medical

---

[6] "Bipolar disorder, formerly called manic depression, is a mental health condition that causes extreme mood swings.  These include emotional highs, also known as mania or hypomania, and lows, also known as depression."  *See* https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955 (last visited Feb. 28, 2025).

"Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column.  The pinched nerve can occur at different areas along the spine (cervical, thoracic[,] or lumbar).  Symptoms of radiculopathy vary by location but frequently include pain, weakness, numbness[,] and tingling.  A common cause of radiculopathy is narrowing of the space where nerve roots exit the spine, which can be a result of stenosis, bone spurs, disc herniation or other conditions.  Radiculopathy symptoms can often be managed with nonsurgical treatments, but minimally invasive surgery can also help some patients. . . . When radiculopathy occurs in the lower back, it is known as lumbar radiculopathy, also referred to as sciatica because nerve roots that make up the sciatic nerve are often involved. . . . Cervical radiculopathy describes a compressed nerve root in the neck (cervical spine).  Because the nerve roots in this area of the spine primarily control sensations in your arms and hands, this is where the symptoms are most

history and summarizes the following medical records because they are most relevant to Mr. Jones's arguments in this appeal.

*Mental Impairments*

Mr. Jones sought mental health treatment at CED Mental Health Center in 2012 and 2013. (Doc. 6-20, pp. 183-192). Mr. Jones reported depression, anger outbursts, isolation, hopelessness, and irritability. (Doc. 6-20, pp. 183, 185, 186, 187, 189, 190). In 2012, Dr. Marino Tulao diagnosed Mr. Jones with major depressive disorder and prescribed Effexor, Prozac, Cymbalta, and Abilify. Mr. Jones reported that Effexor and Prozac made him sick. (Doc. 6-20, pp. 186, 190-191).[7]

---

likely to occur." *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Feb. 28, 2025).

"Chronic pain syndrome (CPS) is a common problem that presents a major challenge to health-care providers because of its complex natural history, unclear etiology, and poor response to therapy. A poorly defined condition, CPS is a constellation of syndromes that usually do not respond to the medical model of care. Most authors consider ongoing pain lasting longer than 6 months as diagnostic, and others have used 3 months as the minimum criterion." *See* https://emedicine.medscape.com/article/310834-overview?form=fpf (last visited Feb. 28, 2025).

[7] Effexor is used to treat depression, generalized anxiety disorder, social anxiety disorder, and panic disorder. *See* https://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379 (last visited Feb. 28, 2025). Prozac is used together with other medications to treat bipolar disorder and "treatment resistant depression in patients who have received at least 2 previous treatments but did not work well." *See* https://www.mayoclinic.org/drugs-supplements/fluoxetine-oral-route/description/drg-20063952 (last visited Feb. 28, 2025). Cymbalta is used to treat depression and anxiety and "pain caused by nerve damage associated with diabetes (diabetic peripheral neuropathy)." *See* https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last visited Feb. 28, 2025). Abilify is used "alone or together with other medicines to treat mental conditions such as bipolar I disorder (manic-depressive illness), major depressive disorder, and schizophrenia." *See* https://www.mayoclinic.org/drugs-supplements/aripiprazole-oral-route/description/drg-20066890 (last visited Feb. 28, 2025).

Mr. Jones saw Dr. Alethia Sellers at UAB on September 16, 2013 and reported anxiety, anger, depression, hopelessness, frustration, and worry.  (Doc. 6-17, pp. 132, 135).  Dr. Sellers noted that Mr. Jones had a cooperative, depressed mood and flat affect.  (Doc. 6-17, p. 136).  Dr. Sellers prescribed Effexor.  (Doc. 6-17, p. 136).

On November 13, 2017, Mr. Jones saw Dr. Muhammad Tariq at Quality of Life and complained of depression, anxiety, hopelessness, and decreased sleep.  (Doc. 6-15, pp. 154, 157).  He had appropriate mood and affect.  (Doc. 6-15, p. 158).  Dr. Tariq referred Mr. Jones to Quality of Life Behavioral Health.  (Doc. 6-15, p. 158).

On January 22, 2018, Mr. Jones saw therapist Aundrea Swain at CED Mental Health Center.  She noted that Mr. Jones was "very angry [and] hostile when he [first] arrived."  (Doc. 6-14, pp. 157, 160).  Mr. Jones indicated that he was unemployed,  was trying to "restart disability," and had spent 10 years in prison for drugs.  (Doc. 6-4, p. 169).  Mr. Jones reported daily visual hallucinations of "black spots and shadows," insomnia, homicidal ideations two months prior, isolation, anger outbursts, severe mood swings, paranoia, and claustrophobia.  (Doc. 6-14, pp. 157-158, 160, 167, 170).  Mr. Jones stated that he was traumatized as a child "when he was closed in a closet every day in elementary school."  (Doc. 6-14, p. 169).  He indicated that he hallucinated about his deceased cousin.  (Doc. 6-14, p. 158).  Mr. Jones scored a 24 on the PHQ-9 depression questionnaire, indicating severe

depression. (Doc. 6-14, p. 158).[8] Ms. Swain noted that Mr. Jones had a depressed, anxious, and agitated mood; poor insight; fair judgment; and adequate attention and concentration. (Doc. 6-14, pp. 156, 160). Ms. Swain's diagnostic impression was bipolar affective disorder, current episode manic with psychotic symptoms. (Doc. 6-14, pp. 161, 171; Doc. 6-20, p. 146).[9]

Mr. Jones told Ms. Swain that he was angry about the Collinsville Police impounding his car on Saturday, January 27, 2018. (Doc. 6-14, p. 155). Mr. Jones stated that if the police came near him, there would be a "shootout." (Doc. 6-14, p. 155). Mr. Jones denied having a gun but indicated he could get one. (Doc. 6-14, p. 155). Ms. Swain called the police and reported the threat, and her supervisor informed front desk staff to call the police if Mr. Jones came to the office. (Doc. 6-14, p. 155).

At a visit with CRNP Romaine Heard in Dr. Tariq's office on March 29, 2018, Mr. Jones scored an 11 on the PHQ-9, indicating moderate depression. (Doc. 6-15, pp. 160-161). Mr. Jones reported that on more than half the days of the previous two weeks, he felt down, depressed, hopeless, and tired and had trouble sleeping and concentrating. (Doc. 6-15, p. 160).

---

[8] A PHQ-9 score of 10-14 indicates moderate depression, a score of 15-19 indicates moderately severe depression, and a score of 20-27 indicates severe depression. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last visited Feb. 28, 2025).

[9] Ms. Swain's diagnostic impression was "F31.2," which is the diagnostic code for bipolar affective disorder. *See* https://icd.who.int/browse10/2015/en#/F31.2 (last visited Feb. 25, 2025).

Mr. Jones missed his therapy appointment on April 30, 2018. (Doc. 6-14, pp. 152-153). On May 3, 2018, Mr. Jones called Ms. Swain and demanded to see the psychiatrist for medication refills. (Doc. 6-14, p. 151). When Ms. Swain explained that Mr. Jones needed to see a therapist, Mr. Jones became belligerent. (Doc. 6-14, p. 151). Ms. Swain wrote that Mr. Jones stated: "'I'm not coming to see no therapist[.] I'm walking in going straight to the doctor's office & yall not going to stop me.'" (Doc. 6-14, p. 151). Ms. Swain informed the front desk to notify the supervisor if Mr. Jones came to the office and stated that she would call the police if Mr. Jones presented with threatening behavior. (Doc. 6-14, p. 151). Mr. Jones did not attend a July 10, 2018 therapy appointment; Ms. Ashley Johnson at CED could not reach Mr. Jones about the missed appointment because his number was disconnected. (Doc. 6-14, p. 150).

On August 6, 2018, Mr. Jones called Ms. Swain for medical refills and stated that he had been in jail. (Doc. 6-14, p. 149). Ms. Swain explained to Mr. Jones that he needed to see a therapist for medical refills and informed him of his August 7, 2018 appointment. (Doc. 6-14, p. 149). When Mr. Jones did not attend his August 7 appointment, a CED staff person called him. (Doc. 6-14, p. 148). Mr. Jones stated that he forgot about the appointment, did not have transportation, and could not come because he was caring for an infant. (Doc. 6-14, p. 148). Mr. Jones indicated that he had been jailed for a drug-related offense. (Doc. 6-14, p. 148). On August 20,

2018, Mr. Jones told Dr. Adam Kessler at the UAB Hospital emergency department that he was not taking some of his psychiatric mediations and had anxiety, claustrophobia, and left eye twitching.  (Doc. 6-14, p. 99).

Mr. Jones went to the Gadsden Regional Medical Center emergency department on August 23, 2018 and complained of severe anxiety, depression, and claustrophobia.  (Doc. 6-18, p. 21).  Mr. Jones reported that he had nightmares and saw "shadows out of the corner of his eye."  (Doc. 6-18, p. 24).  Mr. Jones demanded treatment at "Erlanger, Vanderbilt[,] or Atlanta hospital" and told the attending physician to leave the room.  (Doc. 6-18, p. 36).  Mr. Jones stated that he had been jumping out of cars because of his claustrophobia and that he had not taken his psychiatric medication in months and needed refills.  (Doc. 6-18, p. 36).  He had a flat affect.  (Doc. 6-18, pp. 24, 25).  Dr. Tapan Abrol diagnosed depression and "possibl[e] PTSD," recommended a psychiatry follow up as an outpatient, and "start[ed] [an] SSRI and Prazosin for PTSD."  (Doc. 6-18, p. 25).

On August 27, 2018, Mr. Jones saw a therapist at CED Mental Health Center as a "crisis walk-in."  (Doc. 6-14, p. 146).[10]  Mr. Jones reported anger outbursts, depression, and visual hallucinations.  (Doc. 6-14, p. 146).  He stated that he was angry because of battles with his attorneys, and he was trying to get his disability

---

[10] The name of the therapist is illegible.

reinstated and felt that everyone was against him. (Doc. 6-14, p. 147). The therapist wrote that Mr. Jones was volatile and had an aggressive tone. (Doc. 6-14, p. 147).

On September 11, 2018, Mr. Jones called the CED office and was verbally abusive to front staff and the coordinator. (Doc. 6-14, p. 145). Mr. Jones threatened to come to the office at 3:30 p.m. to "show [them] what he was going to do" and stated that "[w]hen [he got] there, [he would] see the doctor[,] and if not[,] things [would] pop off." (Doc. 6-14, p. 145). The county coordinator and executive director informed the Attalla Chief of Police, and a police officer came to the mental health center. (Doc. 6-14, p. 145). Mr. Jones arrived at 3:49 p.m. carrying a large black trash bag that he stated contained mental health papers and demanded to see the psychiatrist for medication refills. (Doc. 6-14, p. 144). Ms. Swain explained that they had given him a three-month refill on August 27, 2018, but Mr. Jones wanted more medication because the emergency department destroyed his medications. (Doc. 6-14, p. 144). Ms. Swain informed Mr. Jones that his next therapy appointment was September 24, 2018. (Doc. 6-14, p. 144). The police officer escorted Mr. Jones out of the building. (Doc. 6-14, p. 144).

On September 11, 2018, Mr. Jones saw Dr. Robert Smith at Gadsden Regional Medical Center emergency department and complained of stress and anxiety. (Doc. 6-18, p. 4). Mr. Jones stated he was tired of dealing with everyone but denied suicidal and homicidal ideation. (Doc. 6-18, p. 4). He requested Valium. (Doc. 6-

18, p. 4).[11] Mr. Jones indicated that he had his medications with him at an emergency department visit several days earlier, but the hospital did not return his medications. (Doc. 6-18, p. 4). Dr. Smith noted that he spoke with Debbie Brooks at the emergency department, and she found Mr. Jones's medications, gave them back to him, and apologized for his inconvenience. (Doc. 6-18, p. 6).

Mr. Jones did not attend his September 24, 2018 therapy session. (Doc. 6-14, p. 143). At an October 26, 2018 session with therapist Ashley Johnson, Mr. Jones was upset, had a constricted mood, and stated: "F social security, F mental health, F the Judge and the attorney." (Doc. 6-14, p. 142).

On December 20, 2018, Mr. Jones saw Dr. Huma Khusro at CED Mental Health Center. (Doc. 6-12, p. 25). Dr. Khusro noted that Mr. Jones last saw Dr. Feist at the center in January 2018, had issues with noncompliance with treatment, and did not attend seven appointments in 2018. (Doc. 6-12, p. 26). Mr. Jones stated that he had been incarcerated six to seven years for drug-related charges and was jailed for domestic violence in January 2018. (Doc. 6-12, pp. 18, 26). Mr. Jones reported that his twin brother had mental health issues and was on disability; Mr. Jones had

---

[11]  Valium is used to "relieve symptoms of anxiety and alcohol withdrawal. This medicine may also be used to treat certain seizure disorders and help relax muscles or relieve muscle spasm." *See* https://www.mayoclinic.org/drugs-supplements/diazepam-oral-route/description/drg-20072333 (last visited Feb. 28, 2025).

received Social Security disability that was "cancelled" because "he missed an[] appointment." (Doc. 6-12, p. 26).

Mr. Jones reported poor sleep, low energy, stress, and "long standing . . . anger issues that date[d] back to his elementary school years." (Doc. 6-12, p. 26). Dr. Khusro diagnosed "[b]ipolar disorder, current episode manic severe with psychotic features." (Doc. 6-12, p. 27). Mr. Jones requested Valium because it kept him calm, but Dr. Khusro did not prescribe Valium because of Mr. Jones's "tendency to assign blame to others rather than accept responsibility for his own actions." (Doc. 6-12, p. 26). Dr. Khusro prescribed Zoloft, Neurontin, and Abilify. (Doc. 6-12, p. 26).[12]

Mr. Jones called the CED Mental Health Center on January 24, 2019 and complained that his medications were not working; he requested Valium. (Doc. 6-20, p. 161). Mr. Jones saw Dr. Tariq on January 10 and 28, 2019 and complained of extreme anxiety, depression, panic attacks, chest pain related to anxiety, compulsive thoughts, and lack of sleep. (Doc. 6-16, pp. 2-17). Mr. Jones explained that he had seen Dr. Feist at CED Mental Health Center and took valium for his anxiety, but his new psychiatrist would not prescribe Valium. (Doc. 6-16, p. 2). Mr. Jones requested a Valium prescription and refills of his anxiety medication. (Doc. 6-16, pp. 2, 10).

---

[12] Zoloft is used to treat depression, obsessive-compulsive disorder, panic disorder, posttraumatic stress disorder, and social anxiety disorder. *See* https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (last visited Feb. 28, 2025). Neurontin can be used to "relieve the pain of diabetic neuropathy (numbness or tingling due to nerve damage in people who have diabetes)." *See* https://medlineplus.gov/druginfo/meds/a694007.html (last visited Feb. 28, 2025).

Mr. Jones was anxious but had appropriate mood and affect with no suicidal ideation. (Doc. 6-16, pp. 7, 15).

Mr. Jones did not attend therapy appointments at CED Mental Health Center in March, April, and May 2019. (Doc. 6-12, p. 19; Doc. 6-20, p. 161). On August 14, 2019, Mr. Jones saw CRNP Judith Morris and therapist Chardonney Johnson at CED Mental Health Center and reported that he was not doing well. He requested a Valium prescription. (Doc. 6-12, pp. 17-19, 21-24). CRNP Morris noted that Mr. Jones had not seen Dr. Khusro since December 20, 2018. (Doc. 6-12, p. 18). Mr. Jones indicated that he lived with his common law spouse and her children ages five and eleven. (Doc. 6-12, p. 18). Mr. Jones reported that he and his twin brother had the same mental condition and that his brother was in a group home in Louisiana. (Doc. 6-12, pp. 18, 22). Mr. Jones stated that his 24-year-old son had bipolar disorder and schizophrenia, did not take his psychiatric medications, was in jail for stabbing someone, and had multiple assault charges. (Doc. 6-12, p. 18).

Mr. Jones reported daily mood swings, depression rated at 10/10 two to three days a week, daily anger outbursts, trouble sleeping, anxiety, panic attacks, isolative behaviors, and physical pain from four car accidents. (Doc. 6-12, pp. 17-18, 22-23). Ms. Johnson noted Mr. Jones's history of aggressive behavior and non-compliance with treatment. (Doc. 6-12, p. 21). Mr. Jones stated that he did not "like being angry but situations [had] worn [him] down." (Doc. 6-12, p. 22). Mr. Jones stated that he

14

needed to get back on his medications and that Valium was the only medication that helped his anxiety. (Doc. 6-12, pp. 18, 22). Mr. Jones did not take Neurontin and Abilify because they made him sick, and he did not take Zoloft because it made him drowsy. (Dc. 6-12, p. 18).

CRNP Morris noted that Mr. Jones walked slowly and had difficulty moving his head. (Doc. 6-12, p. 17). Mr. Jones had a dysphoric mood, constricted and tearful affect, tangential thought processes, impaired concentration, and limited insight and judgment. (Doc. 6-12, p. 17). CRNP Morris noted Mr. Jones's past attempts to harm others. (Doc. 6-12, p. 17). CRNP Morris diagnosed "[b]ipolar D/O current episode manic severe with psychotic features" and "R/O antisocial personality D/O." (Doc. 6-12, p. 19). CRNP Morris noted that Mr. Jones was unable to manage his psychiatric symptoms independently and needed continued medical treatment. (Doc. 6-12, p. 19). CRNP Morris discontinued Neurontin, Zoloft, and Abilify and prescribed Lexapro. (Doc. 6-12, p. 19).[13] Ms. Johnson increased Mr. Jones's therapy sessions "to address depressive symptoms and anger management." (Doc. 6-12, p. 22).

During an April 7, 2020 telehealth visit with Mr. Johnson, Mr. Jones apologized for his language and behavior during a prior phone call. (Doc. 6-20, p. 162). He

---

[13]    Lexapro is used to treat depression and generalized anxiety disorder. *See* https://www.mayoclinic.org/drugs-supplements/escitalopram-oral-route/description/drg-20063707 (last visited Feb. 28, 2025).

reported anxiety, severe depression, trouble sleeping, bad mood swings, anger outbursts, paranoia, and difficulty riding in cars. (Doc. 6-20, pp. 162-163). Mr. Jones declined to complete a PHQ-9 questionnaire. (Doc. 6-20, p. 166). Mr. Jones reported that he had "been off [] his medications for a while and would like to get back on them ASAP." (Doc. 6-20, p. 162). He requested monthly therapy appointments to "deal with anger." (Doc. 6-20, p. 162). He had an euthymic mood and appropriate affect. (Doc. 6-20, p. 162).

On April 23, 2020, Mr. Jones saw CRNP Morris and reported that he was not doing well and had increased anxiety, irritability, and agitation. (Doc. 6-20, pp. 159-160). CRNP Morris noted that Mr. Jones's last visit to the clinic was August 14, 2019 and that he last saw Dr. Khusro on December 20, 2018. (Doc. 6-20, p. 160). Mr. Jones stated that he needed to get back on his medications and requested Valium because it calmed him. (Doc. 6-20, p. 160). He reported that he had a "brain bleed," needed surgery, had no insurance, and depended on community agencies and the Catholic church to help him with his bills and medications. (Doc. 6-20, p. 160). CRNP Morris diagnosed "[b]ipolar disorder, current episode manic severe with psychotic features," discontinued Lexapro, and gave Mr. Jones a trial of Paxil. (Doc. 6-2, p. 161).[14]

---

[14] Paxil is used to treat depression, obsessive-compulsive disorder, panic disorder, generalized anxiety disorder, social anxiety disorder, and posttraumatic stress disorder. *See*

At a May 11, 2020 telehealth visit with Ms. Johnson, Mr. Jones reported racing thoughts, mood swings, depression, anger outbursts, and paranoia. (Doc. 6-20, p. 156). Mr. Jones stated that he was "waiting on disability to give him his money." (Doc. 6-20, p. 155). He reported that police were bothering him for no reason and stated, "'it's going to be a killing down here in Gadsden before it's all over.'" (Doc. 6-20, p. 156). Mr. Jones denied thoughts of harming himself or others and indicated that he did not have "access to any guns or large knives." (Doc. 6-20, p. 156). He indicated that he was "verbally offensive" to his family. (Doc. 6-20, p. 156). He had a labile mood and blunted affect. (Doc. 6-20, p. 155). He reported no change taking Paxil. Ms. Johnson explained that it might take four to six weeks for the medication to work. (Doc. 6-20, pp. 155, 156).

Mr. Jones did not attend a July 15, 2020 therapy appointment. (Doc. 6-12, p. 63). During a telehealth therapy session with Ms. Johnson on August 5, 2020, Mr. Jones reported that he was "pissed off," frustrated, angry, anxious, and depressed. (Doc. 6-20, p. 151). He stated that "everybody [was] stacked up against him," that he did not know why people kept "messing with him," and that many of his issues stemmed from "'messing with a white woman 25 [] years ago'" and "'dealing drugs.'" (Doc. 6-20, p. 152). He was not taking his medications because they did

---

https://www.mayoclinic.org/drugs-supplements/paroxetine-oral-route/description/drg-20067632 (last visited Feb. 28, 2025).

not work.  (Doc. 6-20, pp. 151, 153).  He had an euthymic mood and appropriate affect.  (Doc. 6-20, p. 151).  At an October 26,  2020 visit with Dr. Tariq, Mr. Jones scored a 2 on the PHQ-2 depression screening questionnaire.[15]  (Doc. 6-12, pp. 116-117).  On the PHQ-2 questionnaire, Mr. Jones indicated he daily had trouble sleeping and had little energy.  (Doc. 6-12, p. 117).  His medications included Vistaril.  (Doc. 6-12, p. 119).[16]

During a November 4, 2020 telehealth visit with therapist April Reed at CED, Mr. Jones reported depression, increased anger, and trouble sleeping.  (Doc. 6-20, pp. 147, 149).  Mr. Jones stated that his "ex-attorney used to threaten him all the time" and told him he "need[ed] to just go get a job," that he had "paranoid thoughts about everybody," and that people at Quality of Life gave him "nasty looks every time."  (Doc. 6-20, p. 148).  Mr. Jones indicated that he coped with his bipolar symptoms by driving "100 miles per hour" while listening to loud music.  (Doc. 6-20, pp. 148, 149).  Mr. Jones stated that he took his mental health medications as

---

[15]  "The PHQ-2 inquires about the frequency of depressed mood and anhedonia over the [prior] two weeks.  The PHQ-2 includes the first two items of the PHQ-9," a more detailed depression screening tool.  The PHQ-2 does not diagnose or monitor the severity of depression but rather screens for depression as a "'first step' approach."  A PHQ-2 score ranges from 0 to 6, with a score of 3 requiring further evaluation.  *See* https://reference.medscape.com/calculator/458/patient-health-questionnaire-2-phq-2 (last visited Feb. 23, 2025).

[16]  Vistaril "help[s] control anxiety and tension caused by nervous and emotional conditions. It can also be used to help control anxiety and produce sleep before surgery."  *See* https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/description/drg-20311434 (last visited Feb. 28, 2025).

prescribed, but they did not help.  He requested Valium.  (Doc. 6-20, p. 147).  Ms. Reed "explained that CED's policy in regards to controlled substances ha[d] changed."  (Doc. 6-20, p. 149).

During a telehealth session with Ms. Washington on February 23, 2021, Mr. Jones stated that he was "not doing well," was not taking his medications, but did not have suicidal or homicidal thoughts.  (Doc. 6-20, p. 141).  He reported daily mood swings, daily anger outbursts, trouble sleeping, isolative behaviors, anxiety riding in a car, and depression that he rated at 10/10.  (Doc. 6-20, p. 143).  He stated that he was incarcerated in January and released in February and that he was moving to Mobile, Alabama and was "looking forward to starting fresh."  (Doc. 6-20, p. 141).  He had a labile mood, flat affect, and normal orientation.  (Doc. 6-20, p. 141).  Ms. Washington noted that Mr. Jones had several barriers to mental health treatment: a history of aggressive behavior, several physical health challenges, issues with non-compliance, legal issues, and incarcerations.  (Doc. 6-20, p. 142).  Mr. Jones stated that his goals were to decrease his daily bipolar symptoms to "less than 3 days/week," have "0 incarcerations for the next 12 consecutive months, attend his scheduled appointments, take his medications, and verbalize concerns to his therapist or psychiatrist as necessary.  (Doc. 6-20, p. 143).  His target date for achieving his goals was "2/23/2022."  (Doc. 6-20, p. 143).  On March 2, 2021, Mr.

Jones had a labile mood and blunted affect and refused to complete a PHQ-9 questionnaire. (Doc. 6-20, pp. 144-145).

Medical records dated August 2021 through February 2023 from Mr. Jones's incarceration at Cherokee County jail showed that he requested to see a "mental doctor" on February 1, 2023. (Doc. 6-21, p. 126). His medications included Wellbutrin, Buspar, and Celexa. (Doc. 6-21, pp. 59, 62, 147, 153, 155, 157, 158).[17] On February 2, 2023, Mr. Jones indicated that Celexa worked well. (Doc. 6-21, p. 59).

On September 3, 2021, Ms. Washington discharged Mr. Jones from outpatient mental health services at CED Mental Health Center because Mr. Jones had not contacted the center and "possibly relocated to Selma, AL." (Doc. 6-20, p. 138). His medications at the time of discharge included Buspar and Neurontin. (Doc. 6-20, p. 138).

*Physical Impairments*

In July 2011, Mr. Jones injured his neck and back at work, and several neurosurgeons evaluated him for workers compensation and cleared him to work.

---

[17] Wellbutrin is used to treat major depressive disorder and seasonal affective disorder. *See* https://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (last visited Feb. 28, 2025). Buspar is used to treat anxiety disorders or to relieve the symptoms of anxiety. *See* https://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457 (last visited Feb. 28, 2025). Celexa is used to treat major depressive disorder. *See* https://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980 (last visited Feb. 28, 2025).

(Doc. 6-13, p. 2; Doc. 6-19, p. 45).  An August 2011 thoracic spine MRI showed mild thoracic spondylosis, "tiny endplate osteophytes at T8-9 and T9-10," and "no focal nerve root compression."  (Doc. 6-18, p. 62; Doc. 6-19, p. 87).[18]  A September 2011 cervical spine MRI showed "early cervical spinal stenosis" at C3-4, "moderate cervical foraminal stenosis" worse at C3-4 and C6-7, and "no focal soft disc protrusion or herniation."  (Doc. 6-18, p. 64; Doc. 6-19, p. 85).[19]

In November 2011, Mr. Jones injured his left shoulder and lower back in a car accident.  (Doc. 6-13, p. 4; Doc. 6-18, p. 67; Doc. 6-19, p. 45).  He reported "electric

---

[18]  "Spondylosis is an umbrella term for different forms of age-related degeneration of the spine." *See* https://www.neurosurgery.columbia.edu/patient-care/conditions/spondylosis (last visited Feb. 28, 2025).  Osteophytes are spurs on the small bones that form the spine that can "narrow the space that contains the spinal cord.  These bone spurs can pinch the spinal cord or its nerve roots . . . [and] cause weakness or numbness in the arms or legs."  *See* https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212 (last visited Feb. 28, 2025).

[19]  "Cervical spinal stenosis occurs when one or more intervertebral foramina (bony openings where the spinal nerves exit the spinal canal) become narrowed within the neck.  When too much narrowing leads to spinal nerve compression and/or inflammation, symptoms of pain, tingling, numbness, and/or weakness may radiate from the neck into the arm."  Cervical foraminal stenosis symptoms can "vary from mild annoyance to severe or debilitating" and can include neck pain; "cervical radicular pain that is electric-like and radiates into the arm or hand"; and "cervical radiculopathy, which includes neurological deficits such as numbness, reflex problems, and/or weakness in the shoulder, arm, hand, or fingers."  *See* https://www.spine-health.com/conditions/spinal-stenosis/cervical-foraminal-stenosis (last visited Feb. 28, 2025).

Cervical spinal stenosis can cause neck pain; numbness, tingling, weakness, and clumsiness in the arm, hand, leg, or foot; and decreased function in the hands.  *See* https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis (last visited Feb. 28, 2025).

"Cervical spinal stenosis does not always cause symptoms.  It is possible to have cervical foraminal narrowing that is visible on medical imaging, such as an MRI, without any associated pain or neurological deficits.  The underlying factors as to why some people with cervical foraminal stenosis have symptoms and others do not is still being researched."  *See* https://www.spine-health.com/conditions/spinal-stenosis/cervical-foraminal-stenosis (last visited Feb. 28, 2025).

shocks" in his lower back after the accident.  (Doc. 6-13, p. 4).  Mr. Jones told Dr. Dallas Wilcox at Doctor's Care that neck pain before the car accident caused left-sided numbness; after the accident, he had "pain along his spine as well as his neck." (Doc. 6-19, p. 45).  A February 2012 cervical MRI showed "small central herniation" at C7-T1, a "small to modest sized left paracentral herniation" at C5-6; "moderate disc bulging and osteophyte" at C4-5; and "modest disc bulging" at C3-4.  (Doc. 6-18, p. 69; Doc. 6-19, p. 81).[20]  A February 2012 lumbar spine MRI without contrast showed a "moderate-sized right paracentral herniation impinging on the thecal sac and the right S1 nerve root" and "modest degenerative facet changes" at L5-S1. (Doc. 6-18, p. 70; Doc. 6-19, p. 80).[21]

Mr. Jones consistently reported neck and back pain at 10/10 in 2012 and between 8/10 and 10/10 in 2013.  (Doc. 6-15, pp. 34-35; Doc. 6-17, p. 171; Doc. 6-

---

[20] "A herniated disk occurs when some of the nucleus pushes out through a tear in the annulus.  A herniated disk is sometimes called a slipped disk or a ruptured disk. . . . If your herniated disk is in your lower back, you'll typically feel pain in your lower back, buttocks, thigh[,] and calf.  You might have pain in part of your foot as well.  For a herniated disk in your neck, you'll typically feel the most pain in your shoulder and arm.  This pain might shoot into your arm or leg when you cough, sneeze[,] or move into certain positions.  Pain is often described as sharp or burning. . . . People who have herniated disks often have radiating numbness or tingling in the body part served by the affected nerves."  *See* https://www.mayoclinic.org/diseases-conditions/herniated-disk/symptoms-causes/syc-20354095 (last visited Feb. 28, 2025).

[21] On April 2, 2012, Dr. Brockington noted that a January 2012 lumbar and cervical spine MRI showed "multilevel disc bulging particularly at the C3-4 level, with some contact of the anterior aspect of the spinal cord, but no adjacent cord signal changes," and "fairly prominent disc herniation at the L5-S 1 level, with some abutment and displacement of the nerve roots."  (Doc. 6-17, p. 190).  The Court could not find a radiology report for a January 2012 MRI.  Dr. Brockington may have been referring to the February 2012 MRI.

18, pp. 75, 91, 100, 106, 107, 116, 143).  Mr. Jones's diagnoses included chronic back and neck pain, lumbar and cervical radiculopathy, chronic pain syndrome, muscle spasms, and sciatica.  (Doc. 6-17, pp. 49, 64, 99, 106, 163, 173, 188, 191; Doc. 6-18, pp. 76, 118, 168; Doc. 6-19, pp. 18, 21, 25, 31, 37, 41).  In October 2012, Dr. Dallas Wilcox at Doctor's Care referred Mr. Jones to pain management.  (Doc. 6-19, p. 22).  Doctors prescribed Lortab, tramadol, meloxicam, Aleve, tizanidine, Lyrica, and Neurontin.  (Doc. 6-17, pp. 9, 19, 30, 48, 50, 51, 164, 171, 172, 180; Doc. 6-18, pp. 88, 102, 122, 138, 140, 168; Doc. 6-19, pp. 17, 20, 22, 23, 26, 28, 32, 35, 39, 42, 47).[22]  At a January 9, 2013 visit with Dr. Roger Buck at Doctor's Care,

---

[22] Lortab is a combination of hydrocodone and acetaminophen used to "relieve pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated."    *See*    https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last visited Feb. 28,2 2025).

"Tramadol is used to relieve moderate to moderately severe pain, including pain after surgery.  It is also used to treat pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated.  The extended-release capsules or tablets are used for chronic ongoing pain."  *See* https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited Feb. 28, 2025).

"Meloxicam is a nonsteroidal anti-inflammatory drug . . . used to relieve the symptoms of arthritis," such as "inflammation, swelling, stiffness, and joint pain."  *See* https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited Feb. 28, 2025).  Aleve also relieves the symptoms of arthritis.  *See* https://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820 (last visited Feb. 28, 2025).

Tizanidine is a muscle relaxer used to treat muscle spasms.  *See* https://my.clevelandclinic.org/health/drugs/20343-tizanidine-capsules-or-tablets (last visited Feb. 28, 2025).

Mr. Jones reported that he was "awaiting court to get his neck operated on" and that he could not take Neurontin or Lyrica. (Doc. 6-19, p. 14). A March 8, 2013 cervical spine MRI showed a diffuse disc, mild spinal stenosis, and minimal left neural foraminal stenosis at C3-4; "mild uncovertebral spurring" and mild neural foraminal stenosis on the left at C4-5; and "uncovertebral spurring on the left" and "moderate left neural foraminal stenosis" at C6-7. (Doc. 6-17, p. 187). A March 22, 2013 lumbar spine MRI showed disc degeneration with "reduced T2 signal," central posterior annular disc fissure, "minimal disc bulge and facet DJD" at L5-S1; mild degenerative changes without significant spinal canal or neuroforaminal stenosis; and no nerve root compression. (Doc. 6-17, p. 178).[23] Mr. Jones had lumbar epidural steroid injections on April 2, 2013 and May 3, 2013 with no relief. (Doc. 6-14, pp. 9-10; Doc. 6-17, pp. 112, 164-167, 174-176).

On May 9, 2013, Mr. Jones was admitted to Gadsden Regional Medical Center for back, leg, and arm pain that he rated at 10/10. (Doc. 6-17, pp. 9, 12). He received

---

Lyrica is sued to treat "pain caused by nerve damage from diabetes or a spinal cord injury." *See* https://www.mayoclinic.org/drugs-supplements/pregabalin-oral-route/description/drg-20067411 (last visited Feb. 28, 2025).

[23] "An annular tear is a fissure or crack on the annulus fibrosis, the thick outer layer of a vertebral disc. This condition can eventually lead to a herniated disc when the gel inside the disc starts to leak out through the disc wall. Although there are many causes for this condition, the most common one is the deterioration of the spine that naturally occurs with age." *See* https://www.bonati.com/conditions/annular-tear/ (last visited Feb. 28, 2025).

IV Toradol and Dilaudid for pain.  (Doc. 6-17, p. 11).[24]  On May 20, 2013, Mr. Jones saw neurologist Dr. John Brockington at UAB and complained of severe back pain radiating down both legs.  (Doc. 6-17, p. 158).  Mr. Jones reported bladder and bowel dysfunction, decreased sensation, and a disturbed gait.  (Doc. 6-17, p. 158).  Mr. Jones reported that movement, standing, and walking aggravated his pain; medication and rest relieved pain.  (Doc. 6-17, p. 158).  Mr. Jones had normal range of motion, sensation, and strength.  (Doc. 6-17, p. 159).  Dr. Brockington prescribed Relafen and baclofen, discontinued Lortab, and ordered a lumbar spine MRI.  (Doc. 6-17, p. 160).[25]

A June 3, 2013 MRI of Mr. Jones's lumbar spine showed multilevel degenerative disc disease; disc, circumferential disc bulge, and "Schmorl node involving the superior endplate of L3" at L2-3; circumferential disc bulge "abutting the anteroinferior aspect of the nerve roots" at L3-4; and circumferential disc bulge with "central dis[c] protrusion and annular tear and moderate bilateral neural

---

[24] Dilaudid is used to "relieve pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated."  *See* https://www.mayoclinic.org/drugs-supplements/hydromorphone-oral-route/description/drg-20074171 (last visited Feb. 28, 2025).

[25] Relafen is an anti-inflammatory drug used to treat "mild to moderate pain and help relieve symptoms of arthritis," such as "inflammation, swelling, stiffness, and joint pain."  *See* https://www.mayoclinic.org/drugs-supplements/nabumetone-oral-route/description/drg-20069686 (last visited Feb. 28, 2025).

Baclofen is a muscle relaxer used to treat muscle spasms.  *See* https://www.mayoclinic.org/drugs-supplements/baclofen-oral-route/description/drg-20067995 (last visited Feb. 28, 2025).

foramen stenosis with dis[c] abutting the L5 exiting roots" at L5-S1 that was slightly worse than the previous MRI.  (Doc. 6-17, p. 156; Doc. 6-19, p. 78).[26]

On July 30, 2013, Mr. Jones saw PA Maria Gonzalez at Gadsden Regional Medical Center emergency department for pain in his lower back, neck, legs, and arms.  (Doc. 6-17, p. 6).  Mr. Jones's physical examination was normal.  (Doc. 6-17, p. 7).  PA Gonzalez diagnosed acute sciatica and chronic lower back pain and ordered an injection of Demerol, Phenergan, and Norflex.  (Doc. 6-17, pp. 7-8).[27]

On August 14, 2013, Mr. Jones saw neurologist Dr. Mark Hadley at UAB.  (Doc. 6-17, p. 151).  Mr. Jones reported severe pain in his neck, lower back, and left leg that he rated at 9/10.  (Doc. 6-17, pp. 151, 153).  Mr. Jones stated that the pain in his neck radiated down his left arm and caused burning and numbness in his left index finger and that he had minor numbness around his penis and rectal area.  (Doc. 6-17, p. 151).  Mr. Jones stated that he was "angry because two prior neurosurgeons 'shut the door' on his face when he met with them" and because "no one [could]

---

[26] "Schmorl's nodes are a type of herniated disk that can affect the spine.  They occur when tissue inside the disks slips out and pushes up or down into adjacent vertebrae.  They are not cancerous and usually cause no symptoms. . . . However, if someone experiences pain or mobility issues due to a Schmorl's node, doctors may recommend conservative treatment with pain-relieving medications and rest."  *See* https://www.medicalnewstoday.com/articles/schmorl-nodes (last visited Feb. 28, 2025).

[27] A Demerol and Phenergan injection is used to treat severe pain.  *See* https://www.mayoclinic.org/drugs-supplements/meperidine-and-promethazine-injection-route/description/drg-20562556 (last visited Feb. 28, 2025).  Norflex is a muscle relaxer.  *See* https://www.mayoclinic.org/drugs-supplements/orphenadrine-oral-route/description/drg-20065214 (last visited Feb. 28, 2025).

solve his problems ongoing [] for 2 years." (Doc. 6-17, p. 151).  He had slow range of motion in his neck, a positive Spurling test on the left side, 4/5 strength in his left arm, weakness in his left hand, normal sensation to light touch, and an antalgic gait on the left side.  (Doc. 6-17, p. 154).[28]

Dr. Hadley noted Mr. Jones's cervical MRI results and stated that he believed that "Mr. Jones ha[d] had an injury as stated" that "best fits with a root stretch, avulsion injury affecting his left upper extremity/hand, C8 primarily, with the potential of a modest left lateral spinal cord injury resulting in sensory deficits [in his] left distal arm, torso[,] and leg." (Doc. 6-17, p. 154).  Dr. Hadley wrote that he did not "identify much on [Mr. Jones's] cervical MRI but potentially a C8 root avulsion injury, incomplete," that an EMG/NCV study was needed, and that he did not have a "surgical solution for Mr. Jones." (Doc. 6-17, p. 154).  Dr. Hadley wrote that because Mr. Jones was "so angry, demanding, accusatory[,] and recalcitrant (justified or not)," Dr. Handley would not "provide further assessment or evaluation" of Mr. Jones and discharged him from the clinic.  (Doc. 6-17, p. 155).

---

[28] "The Spurling Test is designed to reproduce symptoms by compression of the affected nerve root.  The cervical extension is used to induce/reproduce posterior bulging of the intervertebral disk.  Rotation of the head causes narrowing of the neuroforamina in the cervical spine.  Finally, axial compression is applied to amplify these effects with the aim of exaggerating the preexisting nerve root compression." "The test is considered positive when radicular pain is reproduced (pain radiates to the shoulder or upper extremity ipsilateral to the direction of head rotation)." *See* https://www.ncbi.nlm.nih.gov/books/NBK493152/ (last visited Feb. 28, 2025).

On August 15, 2013, Mr. Jones saw Dr. Dallas Wilcox at Doctors' Care and complained of throbbing pain in his left leg for two weeks. (Doc. 6-19, p. 6). Mr. Jones's medications included baclofen, Lortab, and meloxicam. (Doc. 6-19, p. 6). He had 4/5 motor strength in both hands and limited "cerebellar function." (Doc. 6-19, p. 6). Dr. Wilcox referred Mr. Jones to a neurologist for left arm and leg numbness and ordered a brain MRI for left sided numbness and loss of motor strength. (Doc. 6-19, p. 8). The MRI of Mr. Jones's brain was normal. (Doc. 6-17, p. 2).

On August 19, 2013, Mr. Jones saw Dr. Ashlee Fulmer at the UAB pain clinic and complained of back, neck, and buttock pain that he rated at 10/10 and numbness and swelling in his legs and buttocks. (Doc. 6-17, pp. 144, 145). Mr. Jones reported that Lortab helped but did not alleviate his pain, tramadol did not help his pain, and baclofen helped his spasms. He stated that his swelling became worse when he stopped taking meloxicam. (Doc. 6-17, p. 144). Mr. Jones had 4/5 strength on his left side, decreased sensation in his left arm and leg "in a non-dermatomal distribution," and left sided pain with a straight leg test. (Doc. 6-17, p. 147). Dr. Fulmer diagnosed cervicalgia, cervical root lesion, and lumbar radiculopathy. (Doc. 6-17, p. 147).[29] Dr. Fulmer noted that Mr. Jones needed medication management

---

[29] "Lesions of the cervical and lumbar nerve roots are common. These proximal lesions may involve motor and sensory nerve fibers to varying degrees. The initial symptoms of root lesions are nearly always sensory, consisting of paraesthesias and dysesthesias in a radicular distribution.

for his pain and refilled Lortab and baclofen.  (Doc. 6-17, p. 147).  Dr. Fulmer

ordered an EMG/NCS study to evaluate for a "potential C8 root avulsion injury" and

referred him to neuropsychologist Dr. Weisberg.  (Doc. 6-17, p. 147).

On September 10, 2013, Mr. Jones saw Dr. Terry Andrade and reported neck

and back pain and numbness in his left arm and leg.  (Doc. 6-20, p. 2).  He rated his

neck pain at 9/10 and his back pain at 10/10.  (Doc. 6-20, p. 2).  A September 13,

2013 lumbar and cervical myelogram showed spondylosis "appearing more at

cervical levels compared to lumber levels"; "degenerative disc disease with epidural

defects"; degenerative disc thinning, "possible disc bulge and question of

herniation," and "narrowing for the AP effected spinal canal diameter" at C3-4;

minimal-to-mild "evidence of posterior disc bulge" and "chronic disc thinning" at

L5-S1; and possible slight disc bulge at L4-5.  (Doc. 6-12, pp. 131-132; Doc. 6-20,

pp. 65-66).  Cervical and lumbar CT scans on September 13, 2013 showed "mild

posterior symmetrical disc bulge along with thickening of the ligamenta flava

narrowing the AP effective spinal canal diameter to a moderately pronounced to

marked degree, including mild spinal cord flattening, suggesting impingement" at

---

These sensory symptoms are often related to particular postures or activities.  Radicular pain may
be a major feature. . . .  The roots most commonly affected by entrapment are those leaving the
spinal cord at points where spinal movement is greatest, especially at the C5, C6, C7 and C8 levels
in the arm, and at the L4, L5 and 51 levels in the leg." *See*
https://link.springer.com/chapter/10.1007/978-1-4471-3834-
1_9#:~:text=Lesions%20of%20the%20cervical%20and,dysaesthesias%20in%20a%20radicular
%20distribution (last visited Feb. 28, 2025).

C3-4; posterior disk bulge with endplate spurring and moderate narrowing of the "effective spinal canal" with "possible slight flattening of the left aspect of the spinal cord" at C4-5; limited posterior disk bulge, thickening of the ligamenta flava, and moderating narrowing of the effective spinal canal at C5-6 and C6-7; no significant spinal stenosis at T11-12 to L4-5; minimal disk herniation and "[l]imited associated asymmetry for the nerve root sleeves and thecal sac, with question of nerve root compression" at L5-S1.  (Doc. 6-12, pp. 133-136; Doc. 6-20, pp. 69-72).

Mr. Jones saw Dr. Alethia Sellers at UAB pain clinic on September 16, 2013 and complained of back, neck, arm, and leg pain that he rated at 10/10.  (Doc. 6-17, pp. 132-133, 135).[30]   Mr. Jones reported no relief from prior epidural steroid injections.  (Doc. 6-17, p. 132).  Dr. Sellers noted the results of the myelogram. (Doc. 6-17, p. 132).  Mr. Jones had an antalgic gate, pain with range of motion in his cervical and lumbar spine, decreased sensation in his "left C5-6 distribution," and 5/5 strength.  (Doc. 6-17, pp. 135-136).  Dr. Sellers increased the baclofen dosage, prescribed Norco to replace Lortab, prescribed Effexor, and recommended Aleve in place of meloxicam.  (Doc. 6-16, p. 136).

At a visit with neurosurgeon Dr. Terry Andrade on September 17, 2013, Mr. Jones rated his back pain at 10/10 and his neck pain at 9/10 and complained of

---

[30]  Medical student Benjamin Robers recorded the September 19, 2013 medical notes in the presence of Dr. Sellers.  (Doc. 6-17, p. 132).

numbness and tingling in his legs.  (Doc. 6-20, pp. 27-28, 47).  On September 26, 2013, Dr. Michael Morris conducted an EMG and nerve conduction examination on Mr. Jones's left arm and leg.  (Doc. 6-16, pp. 107-109).  All sensory and motor nerve conductions on Mr. Jones's left side were normal.  (Doc. 6-16, p. 107; Doc. 6-20, pp. 44-46).

On October 22, 2013, Mr. Jones was involved in a car accident and saw Dr. Hosam Tarakji at Riverview Regional Medical Center.  (Doc. 6-19, pp. 134, 138). Mr. Jones complained of back, neck, and left leg and arm pain.  (Doc. 6-19, p. 134). Dr. Tarakji noted that Mr. Jones's neck was "[p]ositive for injury or acute deformity."  (Doc. 6-19, p. 139).  A cervical spine x-ray showed "[m]ild multilevel cervical spondylosis."  (Doc. 6-19, p. 145).  Dr. Tarakji diagnosed cervical sprain and prescribed Naprosyn, Robaxin, and tramadol.  (Doc. 6-19, pp. 134, 137, 150).[31]

After his October car accident, Mr. Jones saw chiropractic doctor Royce Jones on October 14, 24, 28, 30, and 31 and November 4, 2013 for headaches and severe pain in his neck; back; right knee, foot[,] and ankle; and left shoulder, hip, leg, and hand.  (Doc. 6-13, pp. 2-26).  Mr. Jones rated his pain at 9/10 to 10/10.  (Doc. 6-13, pp. 17, 23-25).  Mr. Jones reported that his neck and back pain interfered with his

---

[31] Naprosyn is an anti-inflammatory used to treat arthritis.  *See* https://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820 (last visited Feb. 28, 2025).  Robaxin is used to" relieve the discomfort caused by acute (short-term), painful muscle or bone conditions." *See* https://www.mayoclinic.org/drugs-supplements/methocarbamol-oral-route/description/drg-20071962 (last visited Feb. 28, 2025).

daily activities, sleep, and ability to work 82 to 86% of the time.  (Doc. 6-13, pp. 21-22).[32]  Mr. Jones had moderate to severe restriction in flexion and rotation, muscle spasms, and tenderness in his cervical and lumbar spine.  (Doc. 6-13, pp. 6-7, 9-10). Dr. Jones's clinical impressions included cervical and lumbar radiculitis and sprains/strains.  (Doc. 6-13, pp. 7-8, 10-11).  X-rays taken on October 24, 2013 showed moderate disc space narrowing at C3-4 and C6-7; instability with stress during flexion at C2-3 and C4-5; degenerative osteoarthritis over anterior and posterior portions of C3, C6, and posterior portion of C4, C5, and C7; disc space narrowing at T12-L1; moderate disc space narrowing at L5-S1; and "mild compression body of L1 of undetermined age."  (Doc. 6-13, pp. 12-13).   A November 8, 2013 MRI of Mr. Jones's cervical spine showed a "tiny left paracentral annulus tear" at C2-3; "disc osteophyte complex" causing "mild flattening of the left anterior cord" and mild focal spinal stenosis at C3-4; "uncovertebral spurring" causing "slight left bony foraminal encroachment" at C4-5; and "moderate to severe bilateral bony foraminal narrowing" at C6-7.  (Doc. 6-13, p. 32).   Dr. Jones recommended 12 to 18 chiropractic visits, manual traction, interferential stimulation, and three epidural injections if Mr. Jones did not respond well to treatment.  (Doc.

---

[32]  Dr. Jones noted on October 30, 2013 that Mr. Jones was a full-time employee who worked 10 hours a day six days a week; that Mr. Jones had worked one month; and that his complaints did not "affect [his] hours worked."  (Doc. 6-13, p. 19).

6-13, pp. 8, 11).  Mr. Jones did not return to Dr. Jones after the November 4, 2013 visit.  (Doc. 6-13, p. 28).

At a visit with Dr. Muhammad Tariq at Quality of Life on November 19, 2013, Mr. Jones complained of chronic back and neck pain.  (Doc. 6-15, p. 16).  Mr. Jones had muscle spasms in his lumbar spine.  (Doc. 6-15, p. 18).  Dr. Tariq diagnosed chronic lumbago and chronic pain syndrome and referred Mr. Jones to pain management.  (Doc. 6-15, pp. 18-19).  Mr. Jones complained of neck pain at a January 7, 2014 visit, and Dr. Tariq noted the 2013 MRI that showed "mild to moderate cervical foraminal stenosis" at C6-7.  (Doc. 6-15, p. 20).  Mr. Jones had muscle spasms and mildly reduced range of motion in his cervical and lumbar spine. (Doc. 6-15, p. 22).  His medications included Flexeril, Lyrica, tramadol, Valium, and Effexor.  (Doc. 6-15, p. 22).[33]

On September 10, 2014, Mr. Jones saw CRNP Amy Kennedy at UAB and reported severe neck pain and numbness in his left hand.  (Doc. 6-17, p. 129).  Mr. Jones rated his pain at 9/10.  (Doc. 6-17, p. 129).  Mr. Jones stated that he could sit for 45 minutes, stand for 30 minutes, and walk for 10 minutes.  (Doc. 6-17, p. 130). He had tenderness in his cervical and lumbar spine, a positive Spurling test, and 4/5

---

[33]    Flexeril   is   a   muscle   relaxer.    *See*   https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last visited Feb. 28, 2025).

strength in his biceps and triceps. (Doc. 6-17, p. 131). CRNP Kennedy ordered a cervical spine MRI. (Doc. 6-17, p. 131).

On October 7, 2014, Mr. Jones saw CRNP Kennedy and complained of lower back and neck pain that he rated at 10/10. (Doc. 6-14, p. 103). Mr. Jones reported that his neck was difficult to hold up and that physical therapy made his pain worse. (Doc. 6-14, p. 103). Mr. Jones had reduced range of motion with pain in his cervical spine and tenderness in his cervical and lumbar spine. (Doc. 6-14, p. 105). CRNP Kennedy discussed with Mr. Jones a September 19, 2014 MRI that showed "left-sided disc protrusion and mild left neural foramen narrowing due to uncovertebral joint DJD" at C4-5; mild broad-based central disc bulge without spinal cord or definite nerve root compression" at C6-7; and "left-sided degenerative abnormalities [at] both C3-4 and C4-5." (Doc. 6-14, p. 106; Doc. 6-17, p. 127). CRNP Kennedy diagnosed cervicalgia, degeneration of the cervical intervertebral disc, cervical radiculopathy, lumbago, and degeneration of the lumbosacral disc. (Doc. 6-14, p. 106). CRNP Kennedy prescribed naproxen and recommended pain management and a cervical epidural steroid joint injection. (Doc. 6-14, p. 106). Mr. Jones had an epidural injection on December 11, 2014. (Doc. 6-14, pp. 107-110). His post-procedure diagnosis included degeneration of the cervical intervertebral disc and cervical radiculopathy. (Doc. 6-14, p. 109).

A January 14, 2015 lumbar spine MRI without contrast showed "degenerative endplate disease" at L1-2, L2-2, and L5-S1; "stable moderate disc bulge with disc desiccation and a right paracentral annular tear" at L5-S1; "slight narrowing of the right lateral recess encroaching upon the descending right S1 nerve root" at L5-S1; and "moderate bilateral facet arthropathy resulting in moderate neural foraminal [] narrowing with encroachment upon the exiting L5 nerve roots" with "no definite nerve root [] compression or significant spinal canal stenosis." (Doc. 6-14, pp. 14-15, 114).

On January 26, 2015, Mr. Jones saw CRNP Linda Morris at the Gadsden Regional Medical Center emergency department and complained of chronic neck and back pain. (Doc. 6-19, pp. 93-97). He had moderate lumbar tenderness. (Doc. 6-19, p. 96). At a visit with Dr. Chloe Jenkins at UAB pain clinic on January 30, 2015, Mr. Jones complained of neck, shoulder, and back pain and numbness in his legs. (Doc. 6-14, pp. 111, 115). He rated his pain at 9/10, indicated that the epidural injection did not provide relief, and stated that "nothing ma[de] his pain better." (Doc. 6-14, pp. 111, 114). Dr. Jenkins prescribed Neurontin, baclofen, meloxicam, and a TPS compounded cream for his back; referred Mr. Jones to neurology for a nerve conduction study; and indicated that she would consider prescribing

amitriptyline and an epidural steroid injection or a medical branch block if medications did not relieve his pain.  (Doc. 6-14, p. 115).[34]

Mr. Jones saw Dr. Rayelle Nokovich at the UAB Highlands emergency department on March 9, 2015 for neck and left leg pain and left arm numbness and weakness.  (Doc. 6-14, p. 139).  Mr. Jones had deceased range of motion on his left side secondary to pain and 4/5 strength in his left leg.  (Doc. 6-14, pp. 139-140).  Dr. Nokovich diagnosed cervical radiculopathy.  (Doc. 6-14, p. 140).[35]

On May 4, 2015, Mr. Jones saw CRNP Linda Morris at the Gadsden Regional Medical Center emergency department and complained of chronic, severe lower back and left leg pain.  (Doc. 6-19, pp. 63-67).  He had tenderness in his lumbar spine.  (Doc. 6-19, p. 67).  CRNP Morris diagnosed acute left lumbar radiculopathy. (Doc. 6-19, p. 67).  CRNP Morris prescribed Flexeril, Norco, and ibuprofen.  (Doc. 6-19, p. 67).  On May 18, 2015, Mr. Jones returned to the emergency department

---

[34]"Amitriptyline is used to treat the symptoms of depression."  *See* https://www.mayoclinic.org/drugs-supplements/amitriptyline-oral-route/description/drg-20072061 (last visited Mar. 6, 2025).

A diagnostic medical branch block is a test to find the cause of neck and back pain.  "During the test, a doctor will inject a numbing medication around the nerve that supplies [the] facet joints. These are the joints in [the] spine that allow you to bend and twist your neck and back.  The amount of pain relief [] after the injection will help [] determine the cause of [] pain and how to treat it." *See*                                  https://www.brownhealth.org/sites/default/files/lifespan-files/documents/centers/comprehensive-spine-center/Diagnostic-Medial-Branch-Blocks.pdf  (last visited Feb. 28, 2025).

[35]  The record contains a nurse's note and medical screening form from DeKalb County Sheriff's Office dated March 21, 2015, indicating that Mr. Jones was incarcerated on that date.  (Doc. 6-16, pp. 30-31).

and complained of left leg, hip, and back pain. (Doc. 6-19, pp. 58-62). Mr. Jones had tenderness in his back, a positive straight leg test, and normal range of motion. (Doc. 6-19, p. 61). PA Misti Lipscomb prescribed Toradol, Robaxin, and Medrol. (Doc. 6-19, p. 62).

At a visit with Dr. James Bailey at the UAB neurology pain clinic on May 19, 2015, Mr. Jones complained of neck and back pain that he rated at 9/10. (Doc. 6-14, pp. 121-123). Mr. Jones had 5/5 motor strength, intact sensation, normal reflexes, full range of motion, and an antalgic gait. (Doc. 6-24, p. 124). He had difficulty with heel-toe and tandem walking. (Doc. 6-14, p. 124). His mental status exam was normal. (Doc. 6-14, p. 124). Dr. Bailey wrote that he did not "think [Mr. Jones's] relatively minor abnormalities seen on [the] MRI explain[ed] his back/leg problems" because his examination was "essentially normal." (Doc. 6-14, p. 125). Dr. Bailey agreed that Mr. Jones needed "facet blocks," Neurontin, and baclofen and noted that he did not "have additional suggestions to offer in [Mr. Jones's] treatment." (Doc. 6-14, p. 125).

On June 26, 2015, Mr. Jones saw neurologist Dr. John Brockington at UAB and reported severe back pain that radiated down his left leg and moderate neck pain that radiated to his left arm. (Doc. 6-19, p. 54). Mr. Jones stated that movement, prolonged sitting and walking, and changing positions aggravated his pain, and medications and rest helped his pain. (Doc. 6-19, p. 54). He had decreased range of

motion in his neck, normal strength, no tenderness or swelling in his musculoskeletal system, and a normal gait. (Doc. 6-19, p. 56). Dr. Brockington diagnosed cervicalgia and "possible dystonia related disorder." (Doc. 6-19, p. 56).[36] Dr. Brockington agreed with Dr. Hadley's assessment that Mr. Jones was not a surgical candidate but might have a "nerve root avulsion injury and/or cord injury" for which there was no other treatment except "long term pain management." (Doc. 6-19, p. 56). Dr. Brockington gave Mr. Jones a trial of Lamotrigine. (Doc. 6-19, p. 56).[37]

On July 16, 2015, Mr. Jones saw Dr. Tariq and complained of left leg and neck pain that he rated at 8/10. (Doc. 6-15, pp. 36, 39). Dr. Tariq ordered a cervical and lumbar MRI. (Doc. 6-15, pp. 38-39). A July 22, 2015 MRI of Mr. Jones's lumbar spine without contrast showed "[d]isc osteophyte complex [] with a right paracentral annular fissure," mild facet arthropathy, and mild bilateral neuroforaminal stenosis with "[n]o discreet nerve root impingement" at L5-S1; disc desiccation throughout the lumbar spine with mild degenerative changes; no disc herniations at any level; and no "significant central spinal canal stenosis or nerve root impingement" at any

---

[36] "Dystonia is a common movement disorder, involving sustained muscle contractions, often resulting in twisting and repetitive movements and abnormal postures." *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC7894256/ (last visited Feb. 28, 2025).

[37] "Lamotrigine is used alone or together with other medicines to help control certain types of seizures . . . in the treatment of epilepsy. . . . It can also be used in the treatment of bipolar disorder (manic-depressive illness) in adults." *See* https://www.mayoclinic.org/drugs-supplements/lamotrigine-oral-route/description/drg-20067449 (last visited Feb. 28, 2025).

level. (Doc. 6-15, p. 104). A cervical spine MRI without contrast showed "[n]o disc herniations or evidence of spinal cord impingement" at any level; mild "multilevel degenerative changes and spondylosis" at C3-4 and C6-7; "[m]ild grade 1 interior listhesis" at T1-2; mild to moderate bilateral neuroforaminal stenosis at C2-3 and C3-4; and moderate bilateral neuroforaminal stenosis at C6-7. (Doc. 6-15, p. 105).

At an August 4, 2015 visit, Dr. Tariq noted that an MRI showed spondylosis and referred Mr. Jones to pain management. (Doc. 6-15, p. 43) Mr. Jones reported to Dr. Tariq on August 13, 2015 that he had neck and back pain that he rated at 8/10. (Doc. 6-15, p. 46). Dr. Tariq explained that the MRI did not show cervical or lumbar disc herniation, but Mr. Jones insisted on a neurosurgery referral. (Doc. 6-15, p. 46).

On August 18 and 25 and September 10 and 17, 2015, Mr. Jones saw neurosurgeon Dr. Terry Andrade and complained of chronic back, neck, and left leg pain. (Doc. 6-20, pp. 5-21). A September 9, 2015 cervical spine CT scan showed "osteophytic bars with moderate neural foraminal and central canal stenosis" at C3-4, C4-5, and C5-6. (Doc. 6-20, p. 5). A September 9, 2015 lumbar spine CT scan and myelogram were "normal." (Doc. 6-20, p. 5). Dr. Andrade's impressions included cervical spondylosis without myelopathy, cervical and lumbar spinal stenosis, cervicalgia, lumbago, sciatica, and brachial and lumbosacral neuritis or radiculitis. (Doc. 6-20, pp. 9, 16). Mr. Jones's medications included Norco and

meloxicam.  (Doc. 6-20, p. 18).  Dr. Andrade wrote:  "No SURGICAL problem identified."  (Doc. 6-20, p. 21).

Mr. Jones returned to the Gadsden Regional Medical Center emergency department on September 11, 2015 and complained of back and left leg pain.  (Doc. 6-15, pp. 94, 97).  He had normal range of motion in his musculoskeletal system and swelling in his left leg.  (Doc. 6-15, p. 97).  Mr. Jones did not want x-rays but requested pain medication until he could see his doctor.  (Doc. 6-15, p. 98).  CRNP Brandi Malsy prescribed 12 Norco tablets.  (Doc. 6-15, p. 98).

At a January 4, 2016 visit with Dr. Tariq, Mr. Jones reported neck and back pain that he rated at 8/10.  (Doc. 6-15, pp. 51, 55).  Mr. Jones stated (incorrectly) that Dr. Andrade told him that "he had disc issues" in his neck and back and "need[ed] surgery," but Dr. Andrade could not perform surgery because of Mr. Jones's insurance "issues."  (Doc. 6-15, p. 51).  Mr. Jones indicated that he had an appointment at UAB neurosurgery in April 2016 and had been referred to pain management.  (Doc. 6-15, p. 51).  On January 9, 2016, Mr. Jones saw CRNP Lisa Gilbreath and PA Misti Lipscomb at Gadsden Regional Medical Center emergency department for lower back pain radiating to and causing numbness and tingling in his right leg.  (Doc. 6-15, pp. 82, 85).  Mr. Jones stated that his pain "usually sho[t] down his left leg."  (Doc. 6-15, p. 85).  Mr. Jones reported that Dr. Andrade told him that he had a bulging disc in his neck and back and possibly needed surgery.  (Doc.

6-15, p. 85). Mr. Jones had normal range of motion, mild tenderness to palpation, and "mild" muscle spasms. (Doc. 6-15, p. 86). He was prescribed 15 Norco tablets and Flexeril. (Doc. 6-15, p. 87).

On April 6, 2016, Mr. Jones saw Dr. William Meador at UAB Health Centers and complained of muscle spasms and moderate to severe back pain that radiated into his buttocks and left leg. (Doc. 6-14, pp. 74-75). He rated his pain at 8/10. (Doc. 6-14, p. 76). Mr. Jones reported that meloxicam and Lyrica had helped in the past, Neurontin did not help, and past epidural injections helped "a fair amount." (Doc. 6-14, p. 74). Dr. Meador noted that Dr. Hadley did not consider Mr. Jones a "surgical candidate" but opined that Mr. Jones might "have had a nerve root avulsion injury and/or cord injury" and that there might "not be any treatment other than long term pain management" for his cervicalgia. (Doc. 6-14, p. 74). Dr. Meador prescribed Lyrica and tizanidine, and referred Mr. Jones for pain management. (Doc. 6-14, p. 77).

At a visit with Dr. Meador on September 7, 2016, Mr. Jones reported constant, severe pain in his neck and left arm and difficulty holding his neck up on the left side. (Doc. 6-14, p. 25). He rated his pain at 7/10. (Doc. 6-14, p. 27). Mr. Jones stated that he had to hold his head up with his hands because of pain and "laying face down with his head draped over a pillow" helped his pain. (Doc. 6-14, p. 25). Mr. Jones indicated that he did not restart Lyrica after the last visit and that tizanidine

helped less than Robaxin.  (Doc. 6-14, p. 25).  Mr. Jones had normal muscle strength and tone, intact sensation, normal reflexes, and mildly impaired coordination and gait.  (Doc. 6-14, p. 28).  Dr. Meador noted that Mr. Jones had "been unable to establish pain [management] for narcotic pain med[ications] due to [M]edicaid status."  (Doc. 6-14, p. 28).  Dr. Meador prescribed Lyrica and meloxicam, referred Mr. Jones to Dr. Sellers for an epidural pain block, and ordered a cervical spine MRI. (Doc. 6-14, pp. 28-29).  A September 21, 2016 cervical spine MRI showed "left paramedian/foraminal disc osteophyte complex which mildly abuts and indents the left ventral cord" slightly worse than his preceding MRI and "moderate left neural foramen narrowing due to uncovertebral joint DJD."  (Doc. 6-14, pp. 23-24).

At a visit with Dr. Tariq on September 29, 2016, Mr. Jones reported neck pain at 7/10.  (Doc. 6-15, pp. 111, 114).  Mr. Jones had muscle spasms in his cervical spine.  (Doc. 6-15, p. 114).  Mr. Jones saw Dr. Meador on November 2, 2016 and reported pain at 10/10.  (Doc. 6-14, pp. 30, 32).  Mr. Jones stated that Lyrica did not help.  (Doc. 6-14, p. 30).  Dr. Meador noted that Mr. Jones was "politely frustrated" because he had had pain for six to seven years that was "getting worse, not better." (Doc. 6-14, p. 30).  Dr. Meador noted that he spent "more than 40 minutes" explaining to Mr. Jones that "his illness [was] incurable" and that his pain management options were "limited due to his Medicaid insurance."  (Doc. 6-14, p. 33).  Dr. Meador increased the Lyrica dosage, discontinued meloxicam and

tramadol, and referred Mr. Jones to Dr. Staner for a "block vs. surgical eval." (Doc. 6-14, p. 34).

Mr. Jones saw Dr. Tariq on November 16, 2016 and complained of back and neck pain that he rated at 10/10. (Doc. 6-15, pp. 62, 68). Mr. Jones reported that Dr. Meador prescribed Lyrica and was "sending him for neck surgery." (Doc. 6-15, p. 62).[38] Mr. Jones requested a neck brace because he misplaced his previous prescription. (Doc. 6-15, p. 62). Dr. Tariq ordered an MRI of Mr. Jones's lumbar spine and administered a Toradol injection. (Doc. 6-15, p. 67).

On November 18, 2016, Mr. Jones saw Dr. Clement Ayanbadejo at Gadsden Regional Medical Center emergency department and complained of neck, back, and left hip pain after a car accident earlier in the day. (Doc. 6-13, p. 91). Mr. Jones reported that he was scheduled for an MRI of his neck and back that week "in preparation for his surgery in a few weeks" because of a previous car accident. (Doc 6-13, p. 91). He had tenderness to palpation in his back and left hip. (Doc. 6-13, p. 93). A CT scan of his cervical spine showed "[m]ultilevel degenerative dis[c] space changes in the cervical spine most pronounced at C4-5 and C6-7." (Doc. 6-13, p. 79). A lumbar spine CT scan showed "[s]table deformity of the superior endplate of L1." (Doc. 6-13, p. 83). A CT scan of his brain and x-rays of his pelvis were normal. (Doc. 6-13, pp. 85, 87).

---

[38] Dr. Tariq's medical note incorrectly referred to Dr. Meador as "Dr. Miller."

Mr. Jones returned to the emergency department on November 21, 2016 and complained of pain in his chest, neck, back, and left hip and shoulder. (Doc. 6-13, p. 71). Mr. Jones had decreased range of motion and moderate tenderness in his back. (Doc. 6-13, p. 73). CRNP Gilbreath noted that Mr. Jones was irate because he wanted narcotics for pain, that he refused a Toradol injection because Toradol did not alleviate his pain, and that he stated he would continue to come to the hospital via ambulance until he "g[ot] what he want[ed]." (Doc. 6-13, p. 73).

On January 23, 2017, Mr. Jones saw Dr. Thomas Staner, Jr. at UAB's Greystone Neurosurgery Clinic and complained of left neck pain that radiated into his left arm and lower back pain that radiated to his left hip and upper thigh. (Doc. 6-14, p. 18). Mr. Jones had 5/5 strength, a positive left straight leg test, left shoulder pain with adduction, and a positive "foraminal occlusion test" on the left. (Doc. 6-14, pp. 20-21).[39] Dr. Staner's impressions included neural foraminal stenosis of the cervical spine at C3-4, left shoulder pain, and left lumbar and cervical radiculopathy. (Doc. 6-14, pp. 21-22). At a March 8, 2017 visit, Dr. Staner noted that a CT scan and myelogram of Mr. Jones's cervical and lumbar spine showed neural foraminal

---

[39] A foraminal compression test, also called Sparely's Maneuver, is a "physical examination technique which reduces the opening of the foramen which may demonstrate if there is pressure upon the exiting spinal nerve. The test is done to detect spinal nerve root involvement, a herniated disc, bulging disc, or foraminal stenosis. The patient is seated with the head and neck in a neutral position. Pressure is increasingly applied on the head and neck in mild lateral flexion to either side. A positive result replicates numbness or tingling into a dermatome of the upper extremity." *See* https://www.adlergiersch.com/terms/foraminal-compression-test/ (last visited Feb. 28, 2025).

stenosis of the cervical spine at left C6-7.  (Doc. 6-14, p. 8).  Dr. Staner referred Mr. Jones to orthopedics for a left cervical C6-7 epidural block and "possible [l]eft C6-7 neural foraminotomy, possible [l]ateral recess decompression [at] left L4-5, and discectomy [at] left L5-S1."  (Doc. 6-14, p. 8).[40]

Mr. Jones saw Dr. Michael McCarty and CRNP Lisa Gilbreath at Gadsden Regional Medical Center emergency department on February 11, 2017 and complained of worsened neck and left shoulder pain after a car accident that morning.  (Doc. 6-13, p. 67).  He rated his pain at 10/10.  (Doc. 6-13, p. 67).  Mr. Jones reported that he had had a motor vehicle accident three months earlier and was scheduled for a myelogram and MRI of his neck.  (Doc. 6-13, p. 67).  Dr. McCarty diagnosed chronic neck and right shoulder pain and prescribed Flexeril, Norco, and Toradol.  (Doc. 6-13, pp. 69-70).

At a visit with CRNP Kristen Cravens at UAB on April 18, 2017, Mr. Jones complained of left shoulder and neck pain that he rated at 10/10.  (Doc. 6-14, p. 2).  Mr. Jones had neck pain with range of motion in flexion, extension, and lateral

---

[40]  A foraminotomy is a surgical procedure that "enlarges the area around one of the compressed nerves in [the] spinal column."  *See* https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/foraminotomy (last visited March 5, 2025).

Disc decompression procedures treat "chronic pain, numbness or weakness that radiates down the arms or legs [] caused by nerve compression.  These procedures create space in the spine to relieve pressure on the spinal cord or nerves."  A discectomy surgery "creates space in the spine by removing a damaged part of a dis[c]."  *See* https://www.mayoclinichealthsystem.org/hometown-health/speaking-of-health/understanding-types-of-back-surgery (last visited March 5, 2025).

bending.  (Doc. 6-14, p. 4).  He had positive Hawkins and Speed's tests and 5/5 strength in his left shoulder.  (Doc. 6-14, p. 3).[41]  A left shoulder x-ray showed a 3cm "eccentric well-defined" lesion in his "lateral humeralmetaphysis" consistent with a "nonaggressive[,] nonossifying fibroma" and "mild-to-moderate degenerative changes at the acromioclavicular joint with an [] osteochondral body seen within the AC joint space."  (Doc. 6-14, pp. 4-5).[42]  CRNP Craven's impressions included biceps tendonitis, "shoulder impingement," and "AC joint arthritis."  (Doc. 6-14, p. 4).  CRNP Craven prescribed physical therapy and voltaren gel for pain.  CRNP Crave referred Mr. Jones to Dr. Behnke for the fibroma.  (Doc. 6-14, p. 4).

On April 21, 2017, Mr. Jones saw Dr. Johnny Carter and Dr. Cassandra Renfro at UAB and complained of constant neck pain that radiated to his left hand and back of his head.  (Doc. 6-14, pp. 9, 11).  Mr. Jones reported numbness and weakness in his left hand that caused him to drop things and was worse at night and when he held

---

[41] "Hawkin's test is used to detect rotator cuff impingement. . . .  A positive test is pain with this movement."  *See* https://mskmedicine.com/clinical_skills/hawkins-test/ (last visited Feb. 28, 2025).

"A positive on Speed's test means that one of a number of complications has occurred in [the] shoulder," and "[p]ain is a positive result in terms of this test."  *See* https://www.webmd.com/pain-management/what-to-know-speeds-test-yergasons-test (last visited Feb. 28, 2025).

[42] "A fibroma is a noncancerous tissue growth.  There are many different types of fibromas, categorized by their presentations and where they are found on the body.  Fibromas can form anywhere and usually do not require treatment or removal. . . . In most cases, fibromas are not serious and do not indicate a malignant or cancerous growth.  However, in some cases, fibromas can become debilitating."  *See* https://resources.healthgrades.com/right-care/symptoms-and-conditions/fibroma (last visited Mar. 5, 2025).

his son on his left side or stayed in bed too long.  (Doc. 6-14, p. 11).  Mr. Jones rated his pain at 10/10.  (Doc. 6-14, p. 11).  Mr. Jones had decreased cervical range of motion with flexion and extension, decreased rotation and side bending in his cervical spine, and a positive Spurling test on the left side.  (Doc. 6-14, pp. 12-13).  Dr. Carter's diagnoses included neural foraminal stenosis of the cervical spine at C4-5, cervical radiculitis, neck pain, facet arthropathy, and degeneration of the cervical intervertebral disc.  (Doc. 6-14, p. 17).  Dr. Carter ordered an updated "EMG/NCS," referred Mr. Jones to the pain clinic for two cervical epidural injections, and prescribed Robaxin.  (Doc. 6-14, p. 17).  Dr. Carter noted that depending on the nerve conduction test results and effects of the epidural injections, he would "consider further evaluation for surgical treatment options."  (Doc. 6-14, p. 17).

On June 23, 2017, Mr. Jones saw Dr. Luz Crystal at the DeKalb Regional Medical Center emergency department for moderate right knee pain.  (Doc. 6-13, p. 126).  He stated that his knee buckled when he stepped out of bed.  (Doc. 6-13, p. 126).   He had limited range of motion in his right knee, 5/5 strength in his extremities, and a normal gait.  (Doc. 6-13, p. 126).  An x-ray of his right knee was normal.  (Doc. 6-13, p. 129).  Dr. Crystal prescribed a knee brace and prescribed a steroid.  (Doc. 6-13, p. 127).  At a visit with Dr. Tariq on June 27, 2017, Mr. Jones complained of severe right knee pain aggravated by walking and standing.  (Doc. 6-15, p. 124).  Mr. Jones had tenderness, swelling, and pain with range of motion in

his right knee.  (Doc. 6-15, p. 127).  Dr. Tariq prescribed ibuprofen, advised Mr. Jones to avoid heavy lifting and repetitive motions, and referred him to an orthopedic surgeon.  (Doc. 6-15, p. 128).

Mr. Jones saw Dr. William Haller, III at Gadsden Orthopaedics Associates on July 7, 2017 and complained of severe right knee pain from a previous fall.  (Doc. 6-13, pp. 103, 105, 108).  Mr. Jones had swelling in his legs and feet, joint pain and swelling, back pain, muscle weakness, and muscle cramps.  (Doc. 6-13, p. 105).  Dr. Haller noted that Mr. Jones's right knee exam was abnormal with pain and tenderness.  (Doc. 6-13, p. 105).  An x-ray of Mr. Jones's right knee was normal. (Doc. 6-13, p. 106).  Dr. Haller prescribed Meloxicam.  (Doc. 6-13, pp. 106, 108).

On July 14, 2017, an ambulance brought Mr. Jones to the DeKalb Regional Medical Center emergency department after he fainted and became unresponsive while shopping in a store.  (Doc. 6-13, p. 114).  Mr. Jones had a headache, confusion, lightheadedness, nausea, and weakness.  (Doc. 6-13, p. 114).  Dr. Shannon Morgan noted that Mr. Jones had a normal neurological exam, full range of motion and 5/5 muscle strength in his extremities, and a normal gait.  (Doc. 6-13, p. 114).  A chest x-ray and CT scan of his head were normal.  (Doc. 6-13, pp. 123-124).  His drug screen was positive for cocaine.  (Doc. 6-13, p. 121).  Mr. Jones stated that he was

"going to [the] Correctional Facility" and left the hospital "against medical advice." (Doc. 6-13, p. 116).[43]

On November 13, 2017, Mr. Jones saw Dr. Tariq and complained of right knee and neck pain that he rated at 10/10. (Doc. 6-15, p. 154). He reported decreased mobility, numbness and tingling in his right foot, and insomnia. (Doc. 6-15, p. 154). Dr. Tariq referred Mr. Jones to neurosurgery for pain medication. (Doc. 6-15, p. 158).

On March 24, 2018, Mr. Jones fell in the shower, hit his head, lost consciousness for about five minutes, and suffered a closed head injury. (Doc. 6-14, pp. 87, 89). Mr. Jones reported that a friend pulled him out of the shower and called an ambulance, and the ambulance brought him to the local emergency department. (Doc. 6-14, p. 87).[44] A CT scan of his brain showed a possible hemorrhage. Mr. Jones was transferred to UAB hospital for a neurosurgical evaluation. (Doc. 6-14, p. 87; Doc. 6-18, p. 57). Dr. Matthew Neth admitted Mr. Jones for a possible intraparenchymal hemorrhage. (Doc. 6-14, pp. 81, 86). Mr. Jones complained of headaches, neck pain, numbness, and weakness. (Doc. 6-14,

---

[43] The record contains a nurse's note and medical screening form from DeKalb County Sheriff's Office dated July 15, 2017, indicating that Mr. Jones was in jail on that date. (Doc. 6-16, pp. 32-33).

[44] The emergency room records indicated that Mr. Jones fell "while in the shower at a local jail." (Doc. 6-18, p. 56). Dr. Tariq's March 29, 2018 medical notes indicate that Mr. Jones fell in the shower while he was in the Etowah County jail. (Doc. 6-15, p. 161).

p. 81).  Mr. Jones had 4/5 strength in his left upper arm, 5/5 strength in all other extremities, and  decreased sensation in his left upper arm.  (Doc. 6-14, p. 83).  A CT scan of Mr. Jones's head showed a "[m]inimal asymptomatic hemorrhage." (Doc. 6-14, pp. 84, 89, 97; Doc. 6-18, p. 44).  A cervical spine CT showed "[m]ild cervical dis[c] disease noted at C3, C4, and C6" but "[n]o acute cervical spine injury."  (Doc. 6-18, p. 46).  Lumbar spine x-rays showed a "small Schmorl node" within the "superior endplate of L1" but did not show "evidence of acute fracture, lytic, or blastic lesion."  (Doc. 6-18, pp. 48, 52).  A cervical spine x-ray showed mild cervical disc disease at C3 but no acute bony injury.   (Doc. 6-18, p. 50). Neurosurgery evaluated Mr. Jones and recommended "no further neurosurgical intervention."  (Doc. 6-14, pp. 86, 87, 89, 93).  Mr. Jones's diagnoses included intracerebral hemorrhage, cervical strain, and chronic left arm weakness and numbness.  (Doc. 6-14, pp. 85-86).

Mr. Jones saw CRNP Romaine Heard in Dr. Tariq's office on March 29, 2018 and requested a referral to a neurosurgeon.  (Doc. 6-15, p. 159).  He complained of headaches.  (Doc. 6-15, p. 164).  CRNP Heard referred Mr. Jones to neurosurgeon Dr. Dawkins at UAB for evaluation and treatment.  (Doc. 6-15, p. 164).  On April 9,

2018, Mr. Jones saw Dr. Tariq and complained of pain at 9/10 and requested a referral to pain management. (Doc. 6-15, p. 167).[45]

On August 20, 2018, Mr. Jones saw Dr. Adam Kessler at the UAB Hospital emergency department and complained of neck, shoulder, and back pain; blackouts; dizziness; and headaches. (Doc. 6-14, p. 99). Mr. Jones left against medical advice after waiting in the lobby for 13 hours. (Doc. 6-18, pp. 18, 21, 35). Mr. Jones went to Gadsden Regional Medical Center emergency department on August 21, 2018 and was admitted to the hospital. (Doc. 6-18, pp. 15-26, 35-43). Dr. Sandra Carpenter was his attending physician. (Doc. 6-18, p. 15). Mr. Jones reported headaches and blackouts since March 2018 after he fell in the shower. (Doc. 6-18, p. 18). Mr. Jones reported having episodes of confusion and unresponsiveness. (Doc. 6-18, p. 24). He stated that the "black-out spells" happened quickly; he could not remember anything and was lethargic after a spell. (Doc. 6-18, p. 21). Mr. Jones stated that he "was told he had a head bleed." (Doc. 6-18, p. 18). A brain MRI showed a "[r]ight posterior parafalcine 5 mm meningioma, unchanged from 2012" but was otherwise normal. (Doc. 6-18, pp. 18, 27).[46] An echocardiogram showed

---

[45] The record contains a nurse's note and medical screening form from DeKalb County Sheriff's Office indicating that Mr. Jones was in jail on July 16, 2018. (Doc. 6-16, pp. 34-35).

[46] Dr. Carpenter noted that Dr. Tariq had tried to arrange an outpatient brain MRI, but Mr. Jones "recently lost his Medicaid and Medicare." (Doc. 6-18, pp. 35, 36). Dr. Carpenter noted that neurology and the emergency room nurse practitioner asked her to admit Mr. Jones to obtain a brain MRI. (Doc. 6-18, p. 35).

"moderately reduced" left ventricular systolic function, and a carotid doppler was normal. (Doc. 6-18, pp. 18-19, 30-31, 33-34). Dr. Jones administered a low dose of an ACE1 inhibitor and referred Mr. Jones to a cardiologist. (Doc. 6-18, p. 19). Mr. Jones was discharged on August 24, 2018. (Doc. 6-18, p. 15).[47]

Mr. Jones saw Dr. Tariq on August 28, 2018 and complained of musculoskeletal pain that he rated at 8/10. (Doc. 6-15, p. 169). On February 5, 2019, Mr. Jones sought treatment at the Gadsden Regional Medical Center emergency department and complained of moderate neck and back pain. (Doc. 6-12, p. 12). Dr. Rodney Soto noted that Mr. Jones wore a "soft collar" that he said his primary care physician ordered. (Doc. 6-12, p. 12). Mr. Jones reported that his primary care physician referred him to pain management and that he had a follow up appointment with neurosurgery. (Doc. 6-12, p. 12). Mr. Jones stated that his primary care physician was unable to prescribe pain medication and sent Mr. Jones to the emergency department. (Doc. 6-12, p. 12). Mr. Jones requested pain medication "to bridge him through that time." (Doc. 6-12, p. 12). Mr. Jones had normal range of motion, normal strength, and no tenderness or swelling in his musculoskeletal system. (Doc. 6-12, p. 14). Dr. Soto diagnosed chronic neck pain. (Doc. 6-12, p. 15).

---

[47] "Angiotensin-converting enzyme (ACE) inhibitors are medicines that help relax the veins and arteries to lower blood pressure. ACE inhibitors prevent an enzyme in the body from making angiotensin 2, a substance that narrows blood vessels. This narrowing can cause high blood pressure and forces the heart to work harder." *See* https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/ace-inhibitors/art-20047480 (last visited March 6, 2025).

Mr. Jones saw Dr. Tariq on September 23, 2019 and complained of back and neck pain at 7/10.  (Doc. 6-12, pp. 31, 36, 37, 40).  Mr. Jones stated that bending, climbing stairs, lifting, pushing, sitting, walking, and standing aggravated his pain. (Doc. 6-12, p. 31).  Mr. Jones had muscle spasms and moderate pain with range of motion in his thoracic and lumbar spine.  (Doc. 6-12, pp. 36, 37).  Dr. Tariq's diagnoses included spondylosis of the cervicothoracic region, cardiomyopathy, lower back pain, and hypertension.  (Doc. 6-12, pp. 38-39).  Dr. Tariq noted that he would refer Mr. Jones to UAB charity care because Mr. Jones did not have insurance and could not afford the workup for cardiomyopathy.  (Doc. 6-12, p. 38).  At an April 2, 2020 telephone visit with Dr. Tariq, Mr. Jones complained of neck and shoulder pain, hypertension, and cardiomyopathy for which he had not sought medical treatment because he had not applied for UAB charity care.  (Doc. 6-12, p. 80).  Dr. Tariq recommended neck exercises for Mr. Jones's neck pain and encouraged Mr. Jones to complete the UAB charity care paperwork.  (Doc. 6-12, p. 84).

At a visit with Dr. Tariq on June 16, 2020, Mr. Jones complained of difficulty sleeping, "joint instability and locking," lower back pain, and left hip pain after he injured it chasing his dog.  (Doc. 6-12, pp. 87, 91).  Mr. Jones rated his pain at 10/10 when he arrived and 8/10 at the end of the visit.  (Doc. 6-12, p. 93).  Mr. Jones requested a cardiology referral and medication refills.  (Doc. 6-12, p. 87).  Mr. Jones

was positive for joint pain and popping and had tenderness and mildly reduced range of motion in his left hip. (Doc. 6-12, pp. 92-93). He was oriented to time, place, person, and situation and had appropriate mood and affect. (Doc. 6-12, p. 93). Dr. Tariq diagnosed a left hip sprain and gave Mr. Jones a steroid and Toradol injection. (Doc. 6-12, p. 91).

On June 16, 2020, Mr. Jones saw Dr. Scott Kelley and CRNP Lawrence Dudley at the Gadsden Regional Medical Center emergency department after Mr. Jones suffered a reaction to the steroid and Toradol injections that Dr. Tariq administered. (Doc. 6-12, p. 54). Mr. Jones became severely confused, tried to jump out of a window, and ran from Quality of Life. (Doc. 6-12, p. 54). An EMS technician stated that police gave Mr. Jones the options of an evaluation at the emergency department or jail. (Doc. 6-12, p. 54). Mr. Jones's altered mental state resolved while in the emergency department, and his physical and mental examinations were normal. (Doc. 6-12, pp. 54, 56). Dr. Dudley diagnosed an adverse reaction to medication. (Doc. 6-12, p. 57).

At a September 16, 2020 visit with Dr. Tariq and CRNP Phillip Rogers, Mr. Jones complained of a heart condition, left hip pain, left foot numbness, headaches, and a "blood leak in his head." (Doc. 6-12, p. 102). Mr. Jones stated that he was experiencing neck pain and shoulder pain and that he could not feel his left toes "for a while." (Doc. 6-12, p. 102). An x-ray of Mr. Jones's left hip showed early

osteoarthritis but no acute injury.  (Doc. 6-12, p. 110).  Mr. Jones's physical and psychiatric evaluations were normal.  (Doc. 6-12, p. 107).  Dr. Tariq's diagnoses included hypertension, left hip pain, cervicalgia, cardiomyopathy, and headaches. (Doc. 6-12, p. 102).  Dr. Tariq instructed Mr. Jones to take 600 mg of Motrin for his headaches and referred Mr. Jones to an orthopedic surgeon and a cardiologist "ASAP."  (Doc. 6-12, pp. 107-108).

On October 26, 2020, Mr. Jones saw Dr. Tariq and complained of left shoulder pain that was worse at night; neck pain aggravated by exertion, flexion, and hyperextension; burning left arm pain; heart issues; and stress.  (Doc. 6-12, pp. 116-117).  Mr. Jones requested referrals to a pain clinic, orthopedic surgery, and physical therapy; he also requested a left shoulder brace.  (Doc. 6-12, pp. 116, 117, 119).  Mr. Jones had cellulitis and raised lesions under his right shoulder joint that were tender to touch; muscles spasms and mildly reduced range of motion in his cervical spine; and normal range of motion in both shoulders.  (Doc. 6-12, p. 121).  Dr. Tariq referred Mr. Jones to pain management and noted that Mr. Jones had a cardiologist appointment the next day.  (Doc. 6-12, p. 122).

Mr. Jones visited cardiologist Dr. Patel's office on October 27, 2020.  (Doc. 6-12, p. 127).  The notes from the visit indicate that Mr. Jones was mad because he had to pay $150.00 for the visit, cussed out staff because he had to wait, demanded his money back, and jerked the money out of a staff person's hand.  (Doc. 6-12, p.

127).  Dr. Patel instructed his staff not to schedule another appointment for Mr.

Jones.  (Doc. 6-12, p. 127).[48]  Mr. Jones called the Social Security Office and was

irate and used profanity because he had to pay cash at the heart doctor because his

Social Security benefits had been "cut off."  (Doc. 6-8, p. 45).

Medical records from the DeKalb County Sheriff's Office indicate that Mr.

Jones received treatment and medications for back and shoulder pain, hypertension,

and chronic obstructive pulmonary disease during his incarceration between January

and August 2021.  (Doc. 6-16, pp. 37-62).[49]  In January 2021, Mr. Jones complained

of back and shoulder pain and had limited range of motion in his left shoulder.  (Doc.

6-16, pp. 37-38).  Dr. Robert Theakston prescribed naproxen.  (Doc. 6-16, pp. 37-

38).  In February 2021, Mr. Jones complained of left shoulder and arm pain and

numbness, and Dr. Theakston administered a Kenalog and lidocaine injection in Mr.

Jones's shoulder.  (Doc. 6-16, p. 40).[50]  On February 10, 2021, Mr. Jones saw EMT

---

[48]  At the request of the Social Security Administration, Dr. Patel was scheduled to evaluate Mr.
Jones on February 24, 2021.  (Doc. 6-8, p. 46).  Mr. Jones did not bring his identification with him
to the evaluation, left Dr. Patel's office to get his identification, and later called the office to report
that the police had his identification because he recently was released from jail.  (Doc. 6-8, p. 46).

[49]  Records indicate that Mr. Jones was incarcerated from January to mid-February and from March
through August 2021.  Dr. Theakston wrote in his August 4, 2021 notes that Mr. Jones did not
seek treatment between incarcerations.  (Doc. 6-16, p. 54).

[50]  "Acute and chronic shoulder pain can be treated with a shoulder injection" that "includes a
combination of anesthetic (lidocaine or bupivacaine) and steroid (cortisone, Kenalog or
dexamethasone).  The local anesthetic will be responsible for the immediate relief and the steroid
is        used        to        provide        more        long-term        relief."        *See*
https://www.excelpainandspine.com/treatments/shoulder-injection (last visited Feb. 28, 2025).

John Smith and complained of left shoulder and arm pain and numbness. (Doc. 6-16, pp. 41-42). Mr. Jones had no tenderness or weakness in his musculoskeletal system, and he received Tylenol for pain. (Doc. 6-16, pp. 41-42). On February 12, 2021, Mr. Jones saw RN Shalanne Whited for shoulder pain and radiculopathy and chest pain. (Doc. 6-16, pp. 43-45). RN Whited ordered an MRI of Mr. Jones's cervical spine and right shoulder and continued naproxen for pain. (Doc. 6-16, p. 45). Officers transported Mr. Jones to the Dekalb County Regional Medical Center emergency department for his chest pain. (Doc. 6-16, p. 45). Mr. Jones yelled and cursed in the transport vehicle because he was claustrophobic and could not ride in the back of the van. (Doc. 6-16, p. 44). A chest x-ray was normal. (Doc. 6-16, p. 64). Mr. Jones refused an EKG and treatment at the emergency department because he was in corporal restraints. (Doc. 6-16, p. 74).

Mr. Jones returned to the DeKalb County jail on March 4, 2021 and refused his medications on March 5 and 11, 2021. (Doc. 6-16, pp. 49, 51, 63). On March 19, 2021, Mr. Jones saw Dr. Theakston and complained of difficulty breathing. (Doc. 6-16, p. 49). Dr. Theakston noted that he had provided Mr. Jones an inhaler on March 4, 2021, but Mr. Jones denied having an inhaler. (Doc. 6-16, p. 49). On May 21, 2021, Mr. Jones complained of chronic shoulder pain and requested an MRI. (Doc. 6-16, p. 52). On August 4, 2021, Mr. Jones reported right shoulder pain, and

Dr. Theakston administered a right shoulder Kenalog and lidocaine injection and prescribed naproxen. (Doc. 6-10, p. 58).

Medical records dated August 2021 through February 2023 from Mr. Jones's incarceration at Cherokee County jail showed that he complained of pain in his neck, back, and left leg, arm, and shoulder pain. (Doc. 6-21, pp. 1, 60-61, 65-67, 71-72, 93-96, 98-99, 101-102, 110-112, 121, 125, 145). Mr. Jones's diagnoses included degenerative disc disease and cervical spondylosis. (Doc. 6-21, pp. 84, 144). Mr. Jones's medications included naproxen, meloxicam, Flexeril, Tylenol, Robaxin, and baclofen. (Doc. 6-21, pp. 60, 62, 64, 90-91, 97, 134-139, 141-143, 146-148, 153, 155-157). On November 29, 2021, Mr. Jones saw PA James Lombardo at Northeast Orthopedics and complained of moderate neck and left shoulder pain. (Doc. 6-16, pp. 99, 101).[51] Mr. Jones stated that his neck pain was worse when he flexed, extended, or moved his neck and when he used his arms, but rest relieved his pain. (Doc. 6-16, p. 101). Mr. Jones indicated that epidurals, anti-inflammatories, muscle relaxers, and steroids did not help his pain. (Doc. 6-16, p. 101). Mr. Jones had a positive Spurling test and mild bicep and tricep weakness on his left side. (Doc. 6-16, p. 101). PA Lombardo diagnosed cervical spondylosis; he ordered a cervical MRI "followed by an epidural injection for pain relief." (Doc. 6-16, p. 101).

---

[51] Medical staff at the jail scheduled this appointment for Mr. Jones. (Doc. 6-21, p. 92). PA Lombardo's notes indicated that Mr. Jones was incarcerated at the time of this visit. (Doc. 6-16, p. 101).

A January 20, 2022 MRI of Mr. Jones's cervical spine without contrast showed "[m]inimal disc bulge with associated thecal sac effacement but no significant contact of the spinal cord" and "[m]oderate left and mild right neuroforaminal stenosis" at C3-4; "[s]light disc bulge asymmetric to the left with associated thecal sac effacement [] without significant contact of the spinal cord" and "[m]oderate-severe left neuroforaminal stenosis" at C4-5; and "[s]light disc bulge with minimal thecal sac effacement and no significant contact of the spinal cord" at C5-6 and C6-7. (Doc. 6-16, p. 89).[52]

At a March 14, 2022 visit, PA Lombardo noted that Mr. Jones was incarcerated and difficult to examine because he was handcuffed. (Doc. 6-16, p. 100).[53] PA Lombardo noted the January 20, 2022 MRI that showed "moderate to severe left foraminal stenosis" at C4-5. (Doc. 6-16, p. 100). PA Lombardo did not recommend neck surgery but "offered a series of epidurals particularly at the C4-5 level." (Doc.

---

[52] "The symptoms [of neuroforaminal stenosis] vary depending on the severity of the narrowing, the original width of the foramen, and the vulnerability of the nerves affected. The site of the narrowing will determine the location of the symptoms. Cervical foraminal stenosis affects the head, shoulders, upper back, arms, and hands." *See* https://www.bonati.com/conditions/foraminal-stenosis/neural-foraminal-stenosis/ (last visited March 6, 2025).

"There are many potential symptoms of cervical foraminal stenosis, ranging from a mild neck ache to severe, debilitating pain that goes into the arm. The specific symptoms can vary depending on which spinal nerve root is being compressed as well as the severity of the stenosis." *See* https://www.spine-health.com/conditions/spinal-stenosis/cervical-foraminal-stenosis-symptoms (last visited March 6, 2025).

[53] The records for the March 14, 2021 visit listed the "US Marshal Service Chattanooga District" as the "Patient Insurance Information" for the visit and epidurals. (Doc. 6-16, p. 102).

6-16, p. 100).  PA Lombardo noted that if the epidural injections did not provide relief, he would "consider [a] myelography to fully delineate pathology."  (Doc. 6-16, p. 100).  For his shoulder pain, PA Lombardo administered a Kenalog and Marcaine injection.  (Doc. 6-16, p. 100).

### *Consultative Opinions*

#### *Dr. Jack Bentley, Jr.'s Mental Examination*

On June 10, 2012, at the request of the Social Security Administration, licensed psychologist Dr. Bentley examined Mr. Jones and reviewed background information the Social Security Administration provided.  (Doc. 6-20, pp. 199-203).  Dr. Bentley included in his report a discussion of Mr. Jones's self-reported personal, work, and medical history.  (Doc. 6-20, pp. 199-200).  Mr. Jones reported that he was severely depressed, "excessively anxious when the pain [was] most acute," and socially withdrawn.  (Doc. 6-20, pp. 199, 201).  He stated that he had suicidal ideation, crying spells, mood swings, irritability, and poor sleep and that he was not taking psychiatric medications because they did into "significantly improve[] his mood." (Doc. 6-20, pp. 199, 201).  Mr. Jones indicated that he completed his ADLs without assistance.  (Doc. 6-20, p. 201).

Dr. Bentley noted that Mr. Jones "exhibited multiple pain related behaviors," "appeared to be in severe pain during much of the interview," was restless and distractable, "had difficulty focusing his attention span," and had a "slow and

moderately ataxic gait." (Doc. 6-20, p. 200).[54]  Mr. Jones had a severely depressed

mood and was "briefly labile." (Doc. 6-20, p. 200).  Dr. Bentley noted that Mr.

Jones was alert and oriented and had good communication skills, fair eye contact,

and intact immediate memory. (Doc. 6-20, p. 200).  Mr. Jones could not recall three

objects after five-minutes; could not interpret two proverbs; had difficulty with

subtraction, and could not spell "world." (Doc. 6-20, p. 201).

Dr. Bentley administered the Wechsler Adult Intelligence Scale-IV and

assessed Mr. Jones's intellectual functioning. (Doc. 6-20, pp. 201-202).  Mr. Jones

scored a 61 on verbal comprehension, 84 on perceptual reasoning, 66 on working

memory, and 59 on processing speed, resulting in a full scale IQ score of 63. (Doc.

6-20, pp. 201-202).  Dr. Bentley's diagnosed "[m]ild [m]ental [r]etardation,"

moderate to severe major depression, and "[p]sychological [p]roblems [e]ffecting

[p]hysical [h]ealth." (Doc. 6-20, p. 202).[55]  Dr. Bentley wrote:

> [Mr. Jones's] impairment level for complex and repetitive tasks would
> fall into the severe range due both to his mood as well was his reduced
> intellectual functioning.  Although his restrictions due to physical

---

[54] An ataxic gait "is is described as clumsy, staggering movements with a wide-based gait." *See* https://stanfordmedicine25.stanford.edu/the25/gait.html#ataxic-gait (last visited Mar. 26, 2025).

[55]  In 2013, the Social Security Administration replaced the term mental retardation with the term intellectual disability as a listed impairment. *Change in Terminology: "Mental Retardation" to "Intellectual Disability*," 78 Fed. Reg. 46,499 (Aug. 1, 2013) (codified at 20 C.F.R. pts. 404 & 416).  This change was made because "the term 'mental retardation' has negative connotations," and "has become offensive to many people."  78 Fed. Reg. 46,499.  But this change "d[id] not affect the actual medical definition of the disorder or available programs or services."  78 Fed. Reg. at 46,500.

limitations would need to be established by an appropriately trained physician, his behavior during the interview would appear to have a marked impairment on his ability to sustain any work related activities. There would be a marked impairment in his ability to maintain effective communication with co-workers and supervisors.  He would likely need assistance in managing any fund that may be awarded.

(Doc. 6-20, p. 203).  Dr. Bentley opined that Mr. Jones's prognosis was "[g]uarded."

(Doc. 6-20, p. 202).

On May 13, 2013, at the request of the Social Security Administration, Dr. Bentley completed a mental medical source statement of Mr. Jones's mental ability to complete work-related activities.  (Doc. 6-10, pp. 194-196).  Dr. Bentley opined that Mr. Jones had extreme limitations in his ability to carry out complex instructions and to make complex work-related decisions.  (Doc. 6-20, p. 194).  Dr. Bentley opined that Mr. Jones had marked limitations in his ability to understand, remember, and carry out simple instructions; to make judgments on simple work-related decisions; to interact appropriately with the public, supervisors, and co-workers; and to respond appropriately to usual work situations and changes in routine.  (Doc. 6-10, p. 195).  Dr. Bentley found that Mr. Jones's mental limitations dated to 2011. (Doc. 6-10, p. 195).

### *Dr. Usha Nuthi's Physical Examination*

On June 5, 2013, at the request of the Social Security Administration, neurologist Dr. Nuthi reviewed Mr. Jones's medical records provided by the administration and evaluated him.  (Doc. 6-21, pp. 4-11).  Mr. Jones reported severe

pain in his neck, back, and left leg and shoulder; numbness and weakness in his feet, legs, and hands; muscle cramps; daily headaches; and sleep disturbances. (Doc. 6-21 pp. 4, 10). Mr. Jones stated that bending, exercising, laying down, lifting more than 10 pounds, and stress made his pain worse. (Doc. 6-21, pp. 4, 10). Mr. Jones reported that he could tie shoelaces, pick up small objects, button a shirt, hold a glass, and turn a doorknob. (Doc. 6-21, p. 10).

Dr. Nuthi noted that Mr. Jones had a normal mood, appropriate affect, normal speech, and appropriate fund of knowledge. (Doc. 6-21, p. 10). He did not use an assistive devise to walk and had an "appropriate" gait, 5/5 motor strength, intact sensation, normal coordination, a negative straight leg raise test, and a negative Romberg test. (Doc. 6-21, pp. 10-11). Dr. Nuthi noted that Mr. Jones had "decreased effort" on the "left leg hip flexion testing" and "muscle stretch reflexes." (Doc. 6-21, pp. 10, 11). Dr. Nuthi wrote that Mr. Jones had mild to moderate stenosis at C3-4 but did not have "significant weakness, [or] incoordination" and had "good hand grip." (Doc. 6-21, p. 11). Dr. Nuthi assessed low back pain and cervicalgia. (Doc. 6-21, p. 11).

Dr. Nuthi completed a medical source statement regarding Mr. Jones's physical limitations. (Doc. 6-21, pp. 8-9).[56] Dr. Nuthi opined that Mr. Jones could lift and

---

[56] The Court does not have before it Dr. Nuthi's complete medical source opinion because the record contains only pages one and five of Dr. Nuthi's seven-page medical source opinion. (*See* Doc. 6-21, pp. 8-9).

carry 10 pounds frequently and 20 pounds occasionally; occasionally be exposed to unprotected heights and extreme cold; frequently be exposed to moving parts, humidity, wetness, dust, fumes, irritants, extreme heat, and vibrations; and frequently operate a motor vehicle. (Doc. 6-21, pp. 8-9). On a page labeled "PHYSICAL CE EMPHASIS SHEET ADDITION," Dr. Nuthi wrote that Mr. Jones could sit 15 minutes; stand three minutes; and walk, lift, and carry five minutes, with the phrase "per pt." written below these limitations. (Doc. 6-21, p. 7).

### Dr. June Nichols's Mental Examination

On October 24, 2017, at the request of the Social Security Administration, Dr. Nichols, a licensed psychologist at Gadsden Psychological Services, reviewed Mr. Jones's medical record, including Dr. Bentley's report, and evaluated him. (Doc. 6-13, pp. 131-134). Mr. Jones reported that he had "been on disability for the last four or five years," that he missed an appointment with Social Security to attend a neurology appointment in Birmingham, and that the Social Security Administration terminated his benefits. (Doc. 6-13, p. 131). Mr. Jones indicated that he had had severe pain for eight years and needed surgery on his back, but did not have medical insurance. (Doc. 6-13, p. 131). Mr. Jones stated that the "only thing that helped was alcohol," but he had quit drinking four years earlier. (Doc. 6-13, p. 131). He reported that he felt useless because he could not do anything, had crying episodes and decreased energy, and did not want to be around people. (Doc. 6-13, p. 132).

Mr. Jones stated that he had "never been involved in counseling." (Doc. 6-13, p. 131).

Dr. Nichols noted that Mr. Jones had a dysthymic mood, congruent thought processes, good insight and judgment, a frustrated voice, and a sad and tearful affect throughout the assessment. (Doc. 6-13, p. 132). In testing, Mr. Jones could not spell the word "world" backwards; could perform threes but not serial sevens; could add, subtract, and multiply; had fair immediate and remote memory; had adequate fund of knowledge; could not interpret proverbs; and could not complete similarity items. (Doc. 6-13, p. 133). Dr. Nichols concluded that Mr. Jones "function[ed] in the [b]orderline range of intellectual ability." (Doc. 6-13, p. 133). Dr. Nichols noted Dr. Bentley's evaluation and IQ testing results. (Doc. 6-13, p. 134).

Dr. Nichols diagnosed Mr. Jones with severe major depressive disorder, alcohol use disorder that was in remission, mild intellectual disabilities, chronic back pain, left sided radiculopathy and sciatica. (Doc. 6-13, pp. 133-34). Dr. Nichols opined that Mr. Jones had the following limitations:

> [Mr. Jones] appeared able to understand, but often asked for clarification before attempting to carry out instructions. He would likely have problems with understanding, remembering[,] and carrying out instructions. He [was] unable to sustain concentration and persist in a work[-]relate[d] activity at a reasonable pace. He [was] likely unable to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public. He [was] likely unable to deal with normal pressures in a competitive work setting. He [was] likely unable to manage his own funds.

(Doc. 6-13, p. 134). Dr. Nichols indicated that Mr. Jones's prognosis for significant improvement was poor "as the intellectual disabilities would not be expected to improve" and his chronic pain "would not be expected to change" without treatment that Mr. Jones could not afford. (Doc. 6-13, p. 134).

*Dr. Donald Blanton's Telehealth Mental Health Exam*

On July 16, 2020, at the Social Security Administration's request, licensed professional counselor Dr. Blanton conducted a videoconference mental health examination of Mr. Jones. (Doc. 6-12, pp. 65-69). Dr. Blanton indicated that "[t]here were no records available at the time of [the] interview." (Doc. 6-12, p. 65). Mr. Jones reported that he was "always in pain," was easily frustrated and disappointed," and took "some unknown psychiatric medications" that did not help. (Doc. 6-12, p. 65). Mr. Jones stated that he had anxiety, poor sleep[,] and low energy. (Doc. 6-12, p. 66). Mr. Jones rated his neck, hip, and leg pain at 8/10 at the visit, and Dr. Blanton noted that Mr. Jones was "visibly restless." (Doc. 6-12, p. 66). Mr. Jones reported that he could do some housework and cooking, drove occasionally, could stop and handle money, had no friends, spent most of the day at home watching television, did not read well, could text and play games on his phone, and could not exercise because of pain. (Doc. 6-12, p. 66).

Dr. Blanton noted that Mr. Jones was alert and oriented to time, place, person, and situation and had a flat but appropriate affect, a depressed mood, crying spells,

adequate recent and remote memory, and adequate judgment. (Doc. 6-12, p. 66). Mr. Jones did not have hallucinations, suicidal or homicidal ideations, delusions, or paranoia. (Doc. 6-12, p. 66). Dr. Blanton wrote that Mr. Jones "was obsessing about the motor vehicle accident and his ongoing pain." (Doc. 6-12, p. 66). Dr. Blanton noted that Mr. Jones could "do calculations," concretely interpreted similarities and proverbs, and "did four digits forward and three backward." (Doc. 6-12, p. 66). Dr. Blanton estimated that Mr. Jones had "below average" intelligence. (Doc. 6-12, p. 66). Dr. Blanton wrote that Mr. Jones "appear[ed] to have ongoing problems with anxiety and depression likely due to multiple medical problems and worsened chronic pain." (Doc. 6-12, p. 66).

*Dr. Leslie N. Rodrigues's and Dr. Eugene E. Fleece's Administrative Mental Residual Functional Capacity Assessments*

On July 21, 2020, at the request of the Social Security Administration, Dr. Rodrigues reviewed Mr. Jones's medical records and assessed his mental residual functional capacity. (Doc. 6-4, pp. 44-47). Dr. Rodrigues opined that Mr. Jones had marked limitation in his ability to interact appropriately with the general public and moderate limitation in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without distraction; respond appropriately to criticism from supervisors; get along with co-workers or peers without districting

them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Doc. 6-4, pp. 45-46).

Dr. Rodrigues explained that Mr. Jones could:

> carry out simple instructions and sustain attention to familiar tasks for extended periods, but not detailed instructions. [Mr. Jones] would function best with his own work area/station without close proximity to others. [Mr. Jones] could tolerate ordinary work pressures, but should avoid: excessive workloads, quick decision making, rapid changes, and multiple demands. [Mr. Jones] would benefit from regular rest breaks, but would still be able to maintain an acceptably consistent work pace.

(Doc. 6-4, pp. 45-46). Dr. Rodriques noted that Mr. Jones should have limited contact with the public, supportive feedback, tactful and nonconfrontational criticism, and casual contact with co-workers. (Doc. 6-4, p. 46). Dr. Rodriguez opined that Mr. Jones "would be expected to have occasional (less then one third of the time) conflicts with co-workers" and "would likely do best working with a small number of familiar co-workers." (Doc. 6-4, p. 46).

On January 25, 2021, Dr. Fleece completed a mental residual functional capacity assessment after reviewing Mr. Jones's medical records. (Doc. 6-4, pp. 66-70). Dr. Fleece's assessment was identical to Dr. Rodriques's assessment. (Compare Doc. 6-4, pp. 66-70 with Doc. 6-4, pp. 44-47).

*CRNP Angela Foster's Physical Examination*[57]

On July 25, 2020, at the Social Security Administration's request, CRNP Foster reviewed Mr. Jones's medical records and examined him. (Doc. 6-12, pp. 71-76). Mr. Jones reported that he had severe neck, back, and left hip and shoulder pain that "impact[ed] his daily living." (Doc. 6-12, pp. 71-72). Mr. Jones indicated that he could sit for short periods of time less than 15 minutes, stand for a maximum of 45 minutes before had had to sit down and rest, and walk for 200 yards before tiring. (Doc. 6-12, p. 71).

CRNP Foster noted that Mr. Jones was anxious, had "mildly slowed" movements, constantly shifted positions, could stand up from a seated position and get on and off the examination table with "mild difficulty," and used an assistive device and neck brace. (Doc. 6-12, pp. 72, 74). On physical examination, Mr. Jones had 5/5 strength in his right arm, leg, and hand and 3/5 strength on the left; difficulty pinching, grabbing, and manipulating objects; normal sensation; difficulty squatting and rising; difficulty walking on his heels and toes on the left side; a normal gait; and limited range of motion in his neck, back, and left leg and shoulder. (Doc. 6-12, pp. 73-76). CRNP Foster noted that Mr. Jones had limitations sitting and

---

[57] CRNP Foster's assessment appears to have been misidentified in the transcript as performed by "Ashley Nicole Wagner CRNP." (Doc. 6-2, p. 4; Doc. 6-12, p. 70). Mr. Jones referred to CRNP Foster's assessment as the "Wagner Opinion," (Doc. 9, pp, 3-5, 23-24), and the ALJ referenced both "Wagner" and "Foster" in her decision, (Doc. 6-3, pp. 37, 40)

standing, needed to change positions often, had limitations walking but could walk "continuously," and could lift and carry only 10 pounds on the left side because of loss of strength and dexterity in his left arm and leg. (Doc. 6-12, p. 76). CRNP Foster recommended following up with an orthopedic doctor for musculoskeletal pain, a psychiatrist for severe anxiety and paranoia, and a neurologist for nerve pain. (Doc. 6-12, p. 76).

### Mr. Jones's Function Report

At the request of the Social Security Administration, Mr. Jones completed a function report. (Doc. 6-8, pp. 19-26). Mr. Jones did not date the report. (Doc. 6-8, p. 26). Mr. Jones indicated that he cared for a dog with his girlfriend's help. (Doc. 6-8, p. 20). Mr. Jones stated that he needed reminders to take his medication, sometimes prepared meals, cleaned, did laundry, took out the trash, and watched television. (Doc. 6-8, pp. 21, 23). Mr. Jones wrote that he did not like himself and wanted to give up. (Doc. 6-8, pp. 20, 21). For the question regarding whether he drove, Mr. Jones marked "yes and no" but did not explain his answer. (Doc. 6-8, p. 22). He indicated that he could pay bills and count change but could not handle a savings account or use a checkbook. (Doc. 6-8, p. 22). Mr. Jones stated that he did not spend time with others and did not like anybody. (Doc. 6-8, pp. 23, 24). He reported that he did not get along well with family, friends, neighbors, or authority figures; he did not handle stress or changes in routine well. (Doc. 6-8, pp. 24, 25).

Mr. Jones indicated that his physical and mental impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use his hands, understand, follow instructions, pay attention, and get along with others. (Doc. 6-8, p. 24). He reported that his neck and back were "bad" and that he used a neck brace. (Doc. 6-8, pp. 25-26).

### Mr. Jones's Administrative Hearing

The ALJ held an administrative hearing by telephone on February 6, 2023. (Doc. 6-3, p. 53).[58] At the time, Mr. Jones was in jail awaiting trial on drug charges. (Doc. 6-3, pp. 56, 58). He testified that he was convicted of felony drug possession in 1998 and served a jail sentence. (Doc. 6-3, p. 58). Mr. Jones stated that he was in special education in school; he completed the twelfth grade but did not pass the graduation examination. (Doc. 6-3, pp. 56, 64). Mr. Jones indicated that he could read, write, add, subtract, divide, multiply, and use a calculator "some." (Doc. 6-3, p. 57). He could make change for a $20 and pay bills. (Doc. 6-3, p. 57).

Mr. Jones testified that he did not have a work assignment in jail because he injured his back and leg in a work accident in 2011 and in car accidents in 2011, 2013, and 2015. (Doc. 6-3, pp. 59, 62). He stated that he had pain in his neck that radiated into his left arm, was right-handed but had to use his left hand to button a

---

[58] Mr. Jones's attorney was disconnected from the telephone call and missed less than one minute of Mr. Jones's testimony. (Doc. 6-3, p. 63). The ALJ gave Mr. Jones's attorney a summary of the testimony that the attorney missed. (Doc. 6-3, pp. 63-64).

shirt; and dropped items because of pain in his arm.  (Doc. 6-3, pp. 64-65).  He indicated that his back pain radiated to his left leg, that he walked with a limp but did not use a cane, that he could walk about two minutes before needing rest, and that he could stand no longer than five minutes before he had to lay down.  (Doc. 6-3, pp. 61-62, 66).  Mr. Jones stated that he could not bend, stoop, squat, or pick up small items for a "long period of time."  (Doc. 6-3, p. 62).  Mr. Jones testified that epidural injections did not provide relief.  (Doc. 6-3, p. 65).  He stated that he needed knee and shoulder surgery but did not have Medicaid or health insurance.  (Doc. 6-3, pp. 65-66).  Mr. Jones stated that he could not take Tylenol or ibuprofen because he had used the medication for three years.  (Doc. 6-3, p. 68).  Mr. Jones stated that he had trouble sleeping and that he spent all day "except about an hour" lying down to relieve his pain.  (Doc. 6-3, pp. 66, 68).  He indicated that he could not reach overhead with his left arm, could not lift more than two pounds, had difficulty breathing because of COPD, and was short of breath when he climbed stairs.  (Doc. 6-3, pp. 62, 67).

Mr. Jones testified that he could not work because of bipolar disorder, for which he received treatment in the Cherokee County jail.  (Doc. 6-3, p. 59).  Mr. Jones testified that he had anxiety, did not like anybody, and did not like himself.  (Doc. 6-23, p. 61).  Mr. Jones stated that he had been taking Buspar, but doctors at the jail changed the medication, and he could not remember the name of the new

medication. (Doc. 6-3, pp. 59-60). He indicated that he had tried several psychiatric medications that helped for a "little while" or made him worse. (Doc. 6-3, p. 69). Mr. Jones testified that he "was on Social Security for those problems," but his disability stopped when he missed a psychiatrist appointment. (Doc. 6-3, p. 60). He indicated that his mental problem caused him to miss the appointment. (Doc. 6-3, pp. 60, 61). Mr. Jones stated that he had to go to a soup kitchen and had to "do anything [] to make money to provide for [his] family." (Doc. 6-3, pp. 60-61).

The ALJ asked vocational expert James Miller to consider the work available to an individual with no prior work experience with the same age and education as Mr. Jones who could perform light work with the following limitations:

> [could] lift and carry 20 pounds occasionally[] and ten pounds frequently[;] [could] sit, stand, and walk six hours [] during an eight-hour workday[;] [could] push and pull as much as lift and carry[;] [could] climb ramps and stairs frequently[;] [could] climb ladders, ropes, and scaffolds frequently[;] [could] stoop and crawl frequently[;] []should never work at unprotected heights [or] with moving mechanical parts[;] [could have occasional exposure] to humidity and wetness or extreme cold temperatures[;] [] would be restricted to simple [] routine tasks[;] [] could perform simple work-related decisions[;] [] could tolerate occasional contact with coworkers, supervisors, and the general public[;] [and] [] could deal with changes in the workplace defined as infrequent.

(Doc. 6-3, pp. 70-71). Mr. Miller testified that the hypothetical individual could perform light, unskilled work as a folding machine operator, with 58,000 available jobs nationally; as a garment sorter, with 35,000 available jobs nationally; and as a cleaner housekeeper, with 241,000 available jobs nationally. (Doc. 6-3, pp. 71-72).

Mr. Miller testified that those jobs would not be available for an individual who had occasional use of his hands for handling, fingering, or feeling. (Doc. 6-3, p. 73). Mr. Miller stated that an individual could not sustain competitive employment if he was off task 20% of the workday, had to lay down for more than four hours in a workday, could not sustain concentration and persist in work-related activities at a reasonable pace, was in "conflict with supervisors and coworkers," or could not interact with coworkers and supervisors. (Doc. 6-3, pp. 73-75).[59]

## THE ALJ'S DECISION

After the hearing, the ALJ issued an unfavorable decision. (Doc. 6-3, pp. 30-41). The ALJ found that Mr. Jones had not engaged in substantial gainful activity since February 10, 2020, the application date. (Doc. 6-3, p. 32). The ALJ determined that Mr. Jones suffered from the severe impairments of cervical radiculopathy, depression, anxiety, and neurodevelopmental disorders. (Doc. 6-3, p. 32). Based on a review of the medical evidence, the ALJ concluded that Mr. Jones did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 33).

---

[59] The ALJ noted that Mr. Jones's attorney's questions to Mr. Miller regarding interactions with supervisors, co-workers, and the public stemmed from the limitations in Dr. Nichol's report. (Doc. 6-3, p. 74). The ALJ stated that Dr. Nichol's limitations were "not in functional terms based on the way the Dictionary of Occupational Title reads" and asked the attorney to "put [his questions] in functional terms." (Doc. 6-3, pp. 74-75).

Considering Mr. Jones's impairments, the ALJ evaluated Mr. Jones's residual functional capacity. The ALJ determined that Mr. Jones had the RFC to perform light work as defined in 20 CFR 303.1567(b) and 416.967(b) except he frequently could climb ramps, stairs, ladders, ropes, or scaffolds; frequently could stoop and crawl; could never work at unprotected heights or with moving mechanical parts; occasionally could work in humidity, wetness, and extreme cold; could perform simple, routine tasks and make simple work-related decisions; could interact with supervisors; could have occasional contact with coworkers, supervisors, and the general public; and could tolerate infrequent changes in a routine work setting. (Doc. 6-3, p. 34).[60]

Based on this RFC and relying on the testimony from Mr. Miller, the ALJ concluded that Mr. Jones could perform jobs that existed in significant numbers in the national economy, including folding machine operator, garment sorter, and cleaner housekeeper. (Doc. 6-3, pp. 40-41). Accordingly, the ALJ determined that Mr. Jones was not disabled as defined by the Social Security Act. (Doc. 6-3, p. 41).

---

[60] In the ALJ's March 26, 2019 decsion on Mr. Jones's earlier SSI application, the ALJ found, among other limitations, that Mr. Jones had the RFC to perform sedentary work but could not climb ladders or scaffolds, could not crawl, and could "perform jobs dealing primarily with things, not people." (Doc. 6-4, p. 10).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (quoting *T-Mobile South, LLC v. Roswell*, 574 U.S. 293, 301 (2015), and *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (emphasis omitted). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 103 (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (same). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted).  If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59); *see also Mitchell v. Comm'r, Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014) (same).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  That review is *de novo*.  *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).  If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision.  *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1269 (11th Cir. 2019); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Mr. Jones contends that the ALJ improperly considered the medical opinions of several consultative doctors who evaluated Mr. Jones's mental and physical limitations.  Among other things, Mr. Jones argues that the ALJ did not adequately evaluate Dr. Bentley's opinion regarding Mr. Jones's mental limitations.  The Court agrees.

An ALJ must articulate how persuasive "the medical opinions and all of the prior administrative medical findings in [a claimant's] case record" are. 20 C.F.R. § 416.920c(b). When evaluating the persuasiveness of a medical opinion, an ALJ must consider supportability, consistency, relationship with the claimant, specialization, and "other factors." 20 C.F.R. § 416.920c(1)-(5); *see Harner v. Comm'r of Soc. Sec.*, 38 F.4th 892, 897 (11th Cir. 2022). The most important factors are supportability and consistency, and an ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [her] determination or decision." 20 C.F.R. § 416.920c(b)(2).[61] When considering the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). And when considering the consistency of a medical opinion, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 416.920c(c)(2).

---

[61] An ALJ does not have to articulate how he considered the other three factors. 20 C.F.R. § 416.920c(b)(2) ("We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section . . . when we articulate how we consider medical opinions . . . in your case record.").

Here, the ALJ stated that she considered the medical opinions and prior administrative medical findings in accordance with the requirements of 20 C.F.R. § 416.920c. (Doc. 6-3, p. 35). The ALJ stated that she "considered opinion evidence from 2013 associated with a prior application for disability (Exhibits C44F, C45F, C46F), and [found] them to be persuasive for the time period in which they were offered," but she found "more persuasive [Mr. Jones's] current records." (Doc. 6-3, p. 40). Dr. Bentley's June 2012 mental evaluation is Exhibit C44F; his May 2013 mental medical source statement is Exhibit C45F. So, the ALJ found Dr. Bentley's opinion persuasive based on Mr. Jones's mental condition in 2013 but found that Mr. Jones's more recent mental health records were inconsistent with and more persuasive than Dr. Bentley's opinion. The ALJ did not identify the current records that she found more persuasive than Dr. Bentley's opinion, and the Court cannot tell what current records the ALJ had in mind. Dr. Bentley's 2013 opinion that Mr. Jones had marked impairment in his ability to interact appropriately with the public, supervisors, and co-workers, (Doc. 6-10, p. 195), was mostly consistent with Dr. Rodrigues's July 2020 and Dr. Fleece's January 2021 opinions that Mr. Jones had marked limitation in his ability to interact appropriately with the general public and "would be expected to have occasional . . . conflicts with co-workers," (Doc. 6-4, pp. 45-46, 66-70). The ALJ found Dr. Rodrigues's and Dr. Fleece's opinions persuasive and stated that they found Mr. Jones "had no more than moderate

'paragraph B' limitations." (Doc. 6-3, p. 39). The ALJ did not mention Dr. Rodrigues's or Dr. Fleece's opinion that Mr. Jones had marked limitation in his ability to interact with the public or that Mr. Jones occasionally would be expected to have conflict with co-workers and supervisors because of his mental impairments.

Mr. Jones's more recent records support Dr. Bentley's, Dr. Rodrigues's, and Dr. Fleece's opinions that Mr. Jones had marked limitations in his ability to interact with others in a work setting. In January 2018, Mr. Jones's therapist noted that Mr. Jones threatened a shootout with police regarding his impounded car. (Doc. 6-14, p. 155). Mr. Jones cursed his therapist at CED in May 2018. (Doc. 6-14, p. 151). Mr. Jones was volatile and had an aggressive tone with his therapist in August 2018 and was verbally abusive to medical staff at CED in September 2018. (Doc. 6-14, pp. 145-147). In December 2018, his therapist noted Mr. Jones's history of aggressive behavior. (Doc. 6-12, p. 21). In August 2019, CRNP Morris increased Mr. Jones's therapy sessions to address his anger management. (Doc. 6-12, p. 22). Mr. Jones struggled with anger outburst in April 2020 and requested monthly therapy session to deal with his anger. (Doc. 6-20, p. 162). In April 2020, Mr. Jones reported increased irritability and agitation with others. (Doc. 6-20, pp. 159-160). In May 2020, Mr. Jones had anger outbursts, was verbally abusive to his family, and made threatening statements regarding police. (Doc. 6-10, p. 156). Mr. Jones was frustrated and angry in July 2020 and did not understand why people were "messing

with him." (Doc. 6-20, p. 152). Mr. Jones cursed staff in Dr. Patel's office in October 2020. (Doc. 6-12, p. 127). In November 2020, Mr. Jones reported increased anger and had paranoid thoughts about his lawyer and medical providers. (Doc. 6-20, 148). Mr. Jones reported daily anger outbursts in February 2021. (Doc. 6-20, p. 143). Mr. Jones was prescribed psychiatric medications during his incarceration at Cherokee County jail from August 2021 through February 2023. (Doc. 6-21, pp. 58-158). Records pf Mr. Jones's anger outbursts, agitation, irritability, and paranoia from 2018 forward support Dr. Bentley's 2013, Dr. Rodrigues's 2020, and Dr. Fleece's 2021 opinions that Mr. Jones had a marked limitation in his ability to interact appropriately with others in a work setting.

The ALJ found that Mr. Jones had moderate limitations in his ability to interact with others in a work setting. (Doc. 6-3, p. 33). The ALJ recognized that Mr. Jones alleged that he had difficulty in his ability to engage in social activities and get along with others, (Doc. 6-3, p. 33), but the ALJ noted that, according to Mr. Jones's statements, he could "get along with others, shop, spend time with friends and family, and live with others" and was "pleasant and cooperative" with doctors. (Doc. 6-3, p. 33). Mr. Jones's ability to shop occasionally does not negate his inability to respond appropriately to co-workers, supervisors, and the public in a work setting because of his bipolar symptoms. "'[T]he ability to complete tasks in settings that are less demanding than a typical work setting does not necessarily

demonstrate an applicant's ability to complete tasks in the context of regular employment during a normal workday or work week.'" *Smith v. Comm'r of Soc. Sec.*, No. 5:21-cv-00551-PRL, 2024 WL 963725, at *5 (11th Cir. Mar. 6, 2024) (unpublished) (quoting *Schink*, 935 F.3d at 1266).

The Court has not found evidence in the record that Mr. Jones got along with his family or spent time with friends. Mr. Jones reported that he was socially withdrawn, (Doc. 6-20, pp. 199, 201); did not want to be around people, (Doc. 6-13, p. 132); had no friends, (Doc. 6-12, p. 66); did not spend time with others, (Doc. 6-8, pp. 23, 24); and did not get along with family or authority figures, (Doc. 6-8, pp. 24, 25). Records post-dating Dr. Bentley's 2013 opinion reflect that Mr. Jones had difficulty interacting appropriately with authority figures, medical providers, and family members. The fact that a few doctors noted on a few ocassions that Mr. Jones was pleasant and cooperative does not indicate that Mr. Jones could sustain work pressures involving co-workers, supervisors, and the public or interact appropriately with others in a work setting.[62]

The ALJ did not meet her obligation to explain the supportability and consistency of Dr. Bentley's opinion regarding Mr. Jones's inability to interact

---

[62] The Commissioner argues unpersuasively that Dr. Bentley's opinions that "predate the alleged onset disability date are of limited relevance to the question of disability" and that "mental health records during the relevant period demonstrate greater functioning than Dr. Bentley assessed." (Doc. 10, p. 19). As noted, Dr. Bentley's opinion that Mr. Jones had a marked limitation in his ability to interact appropriately in the work setting is mostly consistent with Dr. Rodrigues's and Dr. Fleece's opinions and with Mr. Jones's more recent mental health records.

appropriately in the work setting. Dr. Bentley's opinion about Mr. Jones's marked limitation in his ability to appropriately interact with the public, supervisors, and co-workers in the work setting is significant because VE Miller testified that an individual could not sustain competitive employment if he could not interact appropriately in a work setting or was in conflict with coworkers and supervisors. (Doc. 6-3, pp. 73-75). And the ALJ's inclusion in Mr. Jones's RFC that he could interact appropriately with supervisors ignores Dr. Rodrigues's and Dr. Fleece's opinion that Mr. Jones had moderate limitation and Dr. Bentley's opinion that Mr. Jones had marked limitation in his ability to interact appropriately with supervisors. The ALJ's RFC assessment that Mr. Jones could have occasional contact with the general public does not account for Dr. Bentley's, Dr. Rodrigues's, and Dr. Fleece's opinions that Mr. Jones has marked limitations in his ability to interact appropriately with the public.

Because the ALJ did not provide sufficient reasoning to demonstrate that she conducted a proper legal analysis in evaluating Dr. Bentley's opinion, remand is appropriate. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) (The ALJ's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal"); *see also Spaar v. Kijakazi*, No. 5:20-cv-94, 2021 WL 6498838, at *5, *report and recommendation adopted*, 2022 WL 141613 (S.D.

Ga. Jan. 14, 2022) (concluding that error in failing to address the supportability of medical opinions could not be harmless under the new regulations where the medical opinions, if adopted as a component of the claimant's RFC, could have resulted in the difference between performing light work and being disabled).[63]

Regarding Dr. Nichols's opinion, the ALJ included Dr. Nichol's 2017 opinion as Exhibit C22F and Exhibit C48F to the administrative decision, (Doc. 6-3, pp. 47, 49), but the ALJ did not mention Dr. Nichols's opinion in the administrative decision or discuss the supportability and consistency of the opinion as required by § 416.920c. The Court has not found authority that exempts from the articulation requirement a medical opinion in the record dated before an SSI application date. On remand, the ALJ should articulate the supportability and consistency of Dr. Nichols's opinion as required by § 4126.920c.[64]

---

[63] Because the Court will remand based on the ALJ's improper evaluation of Dr. Bentley's opinions, the Court will not decide the other issues Mr. Jones raised in his brief.

[64] The ALJ also should consider the combined effects of Mr. Jones's chronic, severe pain and severe mental impairments in determining Mr. Jones's RFC. "The RFC assessment must be based on *all* relevant evidence in the case record" including medical history, reports of daily activities, medical source statements, and the effects of symptoms. SSR 96-8p at *5 (italics in SSR 96-8p). In assessing a claimant's RFC, an ALJ must consider the combined effect of the claimant's impairments; an ALJ cannot selectively or separately account for impairments in an RFC and overlook how the impairments collectively impact the claimant's residual functional capacity. *Schink*, 935 F.3d at 1269 (stating that in determining a claimant's RFC, an ALJ must evaluate that "claimant's medical condition taken as a whole").

As discussed in the Court's summary of Mr. Jones's medical records, Mr. Jones has consistently reported severe neck and back pain since at least 2013, and objective medical evidence of moderate to severe cervical stenosis supports his complaints of chronic pain. The fact that doctors did not consider Mr. Jones a surgical candidate does not negate Mr. Jones's severe pain. In 2015, Dr.

**CONCLUSION**

For the reasons discussed above, the Court remands this matter to the Commissioner for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this March 26, 2025.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

Brockingham agreed with Dr. Handley's opinion that Mr. Jones was not a surgical candidate, but Dr. Brockingham thought that Mr. Jones might have a "nerve root avulsion injury and/or cord injury" for which there was no treatment except "long term pain management." (Doc. 6-19, p. 56). Several doctors have referred Mr. Jones to pain management since 2013, and Dr. Meador noted in 2016 that Mr. Jones's "illness [was] incurable" and that his pain management options were "limited due to his Medicaid insurance." (Doc. 6-14, pp. 28, 33).

Dr. Bentley noted Mr. Jones's pain behavior during a mental evaluation and suggested that Mr. Jones would have a marked impairment in his ability to work because of his chronic pain. (Doc. 6-10, p. 203). Dr. Nichols noted that Mr. Jones's prognosis for significant improvement in his mental condition was poor based partly on Mr. Jones's chronic pain. (Doc. 6-13, p. 134). Dr. Blanton indicated that Mr. Jones's anxiety and depression were "likely due to multiple medical problems and worsened chronic pain." (Doc. 6-12, p. 66). On remand, the ALJ should discuss the combined effects of Mr. Jones's chronic pain and severe mental impairments in determining his RFC.